

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 28, 2022

**BY ECF**

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:  *United States v. Hayes, et al.*, 20 Cr. 500 (JGK)

Dear Judge Koeltl:

  The Government respectfully submits this letter in further support of its proposed requests to charge, *see* Dkt. Nos. 211, 221, and in response to the arguments raised by the defendants in their January 14 letter. *See* Dkt. No. 243.

  A. Definition of Futures Commission Merchant

  In its opening letter, the Government set forth certain errors in the defendants' proposed definition of "futures commission merchant." The defendants' letter only underscores why their erroneous instruction would create a risk of misleading the jury about the applicable law.

  First, the statute sets forth a definition of "futures commission merchant" at 7 U.S.C. § 1a(28), and the defendants acknowledge that the Government's proposed instruction accurately conveys the meaning of that definition. Dkt. No. 243, at 1. The defendants assert, however, that the jury should additionally be instructed about the "role that [FCMs] play in the marketplace for commodity derivatives," and in particular, that FCMs typically operate as intermediaries between retail customers and exchanges. *See* Dkt. No. 243, at 1-2. But adding that additional language would mislead the jury into believing that there are additional requirements to be an FCM beyond the statutory definition. That is wrong. While it is true that most FCMs in the commodities market operate as intermediaries with exchanges, there is nothing in the law that defines FCMs as intermediaries or suggests that in order to be an FCM, an entity must intermediate between retail customers and an exchange. It would therefore be incorrect to instruct the jury that being an intermediary is part of the legal definition of an FCM.

  In fact, as detailed in the Government's brief in opposition to the motion to dismiss, the CFTC has routinely brought enforcement actions against entities that operated as unregistered FCMs and also executed their own transactions rather than sending orders to an exchange, and

courts have upheld these actions without any suggestion that there is an additional "intermediary" component to being an FCM. *See, e.g., CFTC v. Monex Credit Co.*, 931 F.3d 966, 969-70 (9th Cir. 2019) (CFTC lawsuit for failure to register as FCM against entity that also "control[led] the platform" on which the trading occurred); *see also In re BFXNA Inc.*, CFTC Docket 16-19, 2016 WL 3137612 (June 2, 2016) (CFTC enforcement action against entity that operated "online trading platform" for failure to register as FCM); *CFTC v. 1Pool Ltd.*, No. 1:18-CV-2243-TNM, 2019 WL 1605201, at *1 (D.D.C. Mar. 4, 2019) (CFTC lawsuit against entity that operated "online trading platform" for failure to register as FCM). As one would expect, cases alleging that an entity operated as an unregistered FCM typically do ***not*** involve an entity that operated as an intermediary. It would be unusual for an unregistered FCM to play an intermediary role with an exchange, because a regulated exchange would generally not accept orders from an unregistered FCM. The issue in this case is whether BitMEX was performing the function of an FCM as that term is set forth in the statute, not whether it served as an intermediary with an exchange, which is irrelevant to the issues to be determined by the jury, and would serve only to confuse the issues if included in the jury charge.

The defendants assert that their proposed language about an FCM's intermediary role is an "accurate statement of the law," but do not identify any legal authority that has held that in order to be an FCM, an entity must be an intermediary that executes orders on a separate exchange. Instead, the defendants identify instances in which courts and the CFTC, in the course of describing the commodities markets or the facts of particular cases, have explained that registered FCMs typically play an intermediary role. *See* Dkt. No. 243, at 2-3. But none of the cases or CFTC statements cited by the defendants purported to be offering a legal definition of an FCM; rather, they were providing a general summary of how market actors typically operate. Those authorities simply provide no support for the defendants' proposed jury instruction.

The defendants attempt to salvage their proposed "intermediary" instruction by arguing that they will contend at trial that they believed they were not an FCM because they also controlled the trading platform, and that they are entitled to an instruction on this "theory of the defense." Dkt. No. 243 at 3. That argument is a complete misreading of the "theory of the defense" line of cases. Those cases plainly do not stand for the proposition that a defendant who claims to have been uncertain about the law can demand that the jury be given an incorrect instruction of what the law is. Instead, if there is evidence at trial to support a particular defense regarding a defendant's state of mind, the defendant is entitled to an instruction regarding that defense. Thus, in the case cited by the defendants, the Second Circuit held that a defendant who had introduced evidence that he did not intend to burn down a building was entitled to an instruction that if the jury credited that evidence, he could not be convicted of arson. *United States v. Durham*, 825 F.3d 716, 718-19 (2d Cir. 1987). By analogy, here, if the defendants introduce evidence that they subjectively believed that BitMEX was not subject to the requirement to have an anti-money laundering program, then they may be entitled to an instruction that if the jury credits that evidence, it cannot convict.[1] But they are certainly not entitled to an instruction that improperly defines what an FCM is, or that adds surplus requirements to the definition of an FCM that do not appear in the statute.

---

[1] The Government is not aware of any such evidence, and expects the evidence at trial will show that the defendants were fully aware of the obligation for BitMEX to have an anti-money laundering program.

The defendants also cite Commissioner Stump's concurrence in the CFTC enforcement action against the entity Payward Ventures (d/b/a Kraken), but that concurrence expressly supports the Government's position in this case. Commissioner Stump explained that she agreed with the CFTC's conclusion "that Kraken's activities meet the definition of an FCM set out in the CEA," and she in no way suggested that Kraken did not meet the definition of an FCM because it also operated as an exchange. Commissioner Stump's statement concurring in the imposition of a civil penalty on an entity that performed the functions of an FCM without registering, while also performing the functions of an exchange, is yet another authority showing that the Government's proposed jury instruction is a correct description of the law.

To be sure, Commissioner Stump did say that it would be unprecedented for an entity to register as both an FCM and a DCM, and called for the CFTC to provide more guidance regarding that issue. But that is perfectly consistent with the CFTC's determination, in which Commissioner Stump concurred, that entities like Kraken and BitMEX that perform the functions of an FCM without registering as such are violating the CEA. Even if the CFTC has not approved a dual FCM/DCM registration by a single entity, that does not mean that an entity is permitted to perform the functions of both types of entities without registering in either capacity. The defendants' attempt to insert surplus language about other types of entities in the jury instructions is purely an attempt to distract and confuse the jury from the issue in the case, which is whether BitMEX performed the functions of an FCM without complying with the legal requirement for an FCM to have an anti-money laundering program.

An additional problem with the defendants' proposed instruction is their erroneous statement that "soliciting orders" does not include marketing. The defendants attempt to defend that language by simply asserting, without citing any legal authority, that it is "supported by the law and common sense." Dkt. No. 243, at 5. That is wrong. As detailed in the Government's initial letter, multiple cases have recognized that marketing for an entity that offers retail commodity transactions meets the CEA's definition of soliciting orders. *See CFTC v. Standard Forex, Inc.*, 1998 WL 236923, at *7 (E.D.N.Y. 1998) (holding that defendant "solicited orders by newspaper advertisement and telephone call"); *CFTC v. Paramount Management, LLC*, No. 13 Civ. 4436 (CM), 2013 WL 5586216, at *3 (S.D.N.Y. Sept. 9, 2013) (holding that a defendant engaged in solicitation through the use of a "website and telemarketing techniques" to "solicit[] the retail public to open leveraged forex trading accounts"). The defendants cite no cases to the contrary.

B. Territorial Scope of Commodity Exchange Act

As detailed in the Government's earlier letter, the relevant statutory provision governing the territorial scope of the CEA as it applies to FCMs is 7 U.S.C. § 6(a). The Government's instruction accurately summarizes the language of this provision, while the bulk of the defendant's instruction is loosely based on CFTC regulatory guidance regarding an entirely different provision, 7 U.S.C. § 2(i), that applies to swap dealers and does not apply to futures commission merchants. In their response letter, the defendants astonishingly double down on their reliance on 7 U.S.C. § 2(i), and quote at length from the CFTC's regulatory guidance documents for swap dealers and commodity pools, none of which are applicable to futures commission merchants. *See* Dkt. No. 243, at 7-8. The defendants attempt to defend this by asserting that those other regulations are "analogous" to FCMs, but that is a simple misstatement of the law. The CFTC has adopted specific regulatory guidance for swap dealers based on the statutory language in 7 U.S.C. § 2(i) that governs swap dealers, and it has not adopted analogous guidance for FCMs, which are governed

by the statutory language in 7 U.S.C. § 6. The entirety of the defendants' proposed jury instruction, which depends on an irrelevant and inapplicable statute and regulatory guidance, should be rejected.

The defendants argue that the Government's proposed instruction is an "extraordinary assertion of jurisdiction" over "any such business anywhere in the world." In fact, the Government's proposed instruction, which accurately conveys the statutory language, limits the territorial scope of the CEA to entities that have operations in the United States, including by marketing to United States persons, providing services to United States persons, or having an office in the United States. *See* Dkt. No. 211, at 9. There is nothing even remotely unusual about this straightforward basis for the exercise of CFTC jurisdiction over entities that have operations in this country.

The defendants' specific objections to some of the wording in the Government's proposed instruction fare no better. First, they claim that the statute does not extend to entities that market to United States customers. As noted above, however, multiple courts have recognized that such marketing is included within the statutory term "soliciting" in 7 U.S.C. § 6. Next, the defendants argue that the statute does not reference United States customers. That is also wrong – the statute applies to "accepting any order" or "otherwise dealing in," "any transaction" for commodity futures in the United States. 7 U.S.C. § 6(a). This language encompasses providing these services to United States customers. *See, e.g., CFTC v. 1pool Ltd.*, 2019 WL 1605201, at *5 (D.D.C. Mar. 4, 2019) (entity that was headquartered overseas was an FCM subject to 7 U.S.C. § 6(a) because it entered into retail commodity transactions "with U.S. persons"). The defendants also argue, once again with no authority, that the statute's application to entities that "conduct any office or business anywhere in the United States," 7 U.S.C. § 6, somehow does not include maintaining a physical office in the United States. That argument is a naked attempt to read the plain language out of the statute.

The defendants further argue that 7 U.S.C. § 6(a) excludes from the CEA's jurisdiction contracts which are "made on or subject to the rules of a board of trade, exchange, or market located outside the United States," and that the Government's proposed instruction does not include that exception. But that exception has no relevance to this case, because the exception "includes only those contracts subject to rules of a foreign board of trade or something similar." *Gonzalez v. Axess Trade Co.*, No. 04 CIV. 3762 (RCC), 2005 WL 1384019, at *3 (S.D.N.Y. June 9, 2005). That is, Congress crafted this exception so the CFTC's regulations would not apply to futures trades conducted on an overseas exchange that were already subject to a foreign regulator. But the exception does not apply to transactions conducted on a market that is "is unregulated and therefore without formally adopted rules." *Id.* The defendants do not contend that BitMEX executed its transactions "subject to the rules" of any regulated overseas board of trade or exchange, and so there is no need to instruct the jury on this irrelevant exception.

The defendants then criticize the language in the Government's proposed instruction that an entity that "knows or has reason to know that it has United States customers" is within the territorial reach of the CEA. They argue that this instruction runs a risk of confusing the jury as to the relevant state of mind for the defendants, because they can only be convicted if they acted willfully in violating the law. First, the Government acknowledges that the phrase "or has reason to know" should not be included here, but that concept should be included in a separate conscious avoidance instruction if the trial evidence supports that instruction. With that change, there is no

risk of confusion in the Government's proposed instruction. The regulation applies to an entity that has United States customers, and the defendants are guilty if they knew the facts giving rise to their legal duty to implement an anti-money laundering program and willfully violated that duty. It is routine for crimes to have both knowledge elements and willfulness elements, and for a jury to be instructed properly as to both. For instance, in the analogous context of a recent sanctions violation trial, Judge Berman instructed the jury that it was a sanctions violation if a financial institution "knowingly conducted or facilitated any financial transaction" relating to petroleum sales with Iran, and then later instructed the jury that the Government must prove that the defendant acted "willfully" to violate these sanctions. *See United States v. Attila*, 15 Cr. 867 (RMB), Tr. at 2409-11. The same reasoning applies here. The BSA regulations apply if BitMEX knew it had United States customers, and the defendants violated the BSA if they willfully violated their resulting legal duty.

C. Virtual Currencies and Cryptocurrencies Are "Commodities" Under the CEA

The Government has proposed that the jury be instructed that virtual currencies and cryptocurrencies are commodities under the CEA. The defendants argue that this is a question of fact to be decided by the jury. But the defendants' letter does not actually argue that a cryptocurrency is not a commodity under the applicable statutory definition. They implicitly seem to concede this point. The Government does not believe there is any real dispute on this legal question, and accordingly, the jury should properly be instructed that cryptocurrency is a commodity.

The statute defines a "commodity," in relevant part, to include a number of specified agricultural products and also "all other goods and articles …, and all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in." Cryptocurrencies clearly meet this standard, as they are goods or articles in which futures contracts are dealt. Thus, the defendants' argument that Congress has not passed a new law specifically including virtual currencies within the definition is beside the point. These products already meet the statutory definition. The CFTC publicly concluded as much in 2015, and the courts have agreed. *See In re Coinflip, Inc.*, CFTC Docket No. 15–29 ("Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities."); *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018) (holding that virtual currencies "fall well within the common definition of 'commodity' as well as the CEA's definition of 'commodities' as 'all other goods and articles ... in which contracts for future delivery are presently or in the future dealt in.'"); *CFTC v. Gelfman Blueprint, Inc.*, Case No. 17-7181 (PKC), 2018 WL 6320656, ¶ 75 (S.D.N.Y. Oct. 16, 2018) (conclusion of law that "virtual currencies such as Bitcoin are encompassed in the definition of 'commodity' under [the CEA]").

The defendants apparently do not take issue with the legal conclusions set forth by the CFTC in *Coinflip*, the court's decision in *McDonnell*, and the court's approval of the consent order in *Gelfman*. Rather, they simply argue that these decisions are "non-binding" on this court. That is technically true, but these decisions are persuasive interpretations of the CEA's definition of "commodity," which is binding and by its terms applies to virtual currencies. It is telling that the defendants do not even attempt to mount an argument that virtual currencies are not commodities as a matter of law. The Court should instruct the jury that they are.

D. Meaning of "Willfully"

The parties agree that the Government must prove that the defendants acted willfully in accordance with the standard articulated by the Supreme Court in *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994). The *Ratzlaf* standard requires the Government to "prove that the defendant acted with knowledge that his conduct was unlawful." *Id.* Here, that means that the defendant must have known of the requirement to have an anti-money laundering program and have intentionally caused BitMEX's violation of that requirement. The Government's proposed instruction says exactly that. Dkt. No. 211, at 17. The defendants wrongly claim that the Government's proposed instruction does not "define the requirement," but that is a mischaracterization of the Government's proposed instruction, which states expressly that the relevant requirement is the requirement to have an anti-money laundering program.

The Government's proposed instruction is in accord with what the Supreme Court required in *Ratzlaf*. In that case, the Court held that the defendant had to know of his duty not to structure transactions in order to be convicted of structuring. *Ratzlaf*, 510 U.S. at 146-47. But the Court did not require that the defendant know the specific regulatory pathway by which he had that duty, which is what the defendants' proposed instruction here attempts to do. The defendants seek a jury instruction that the Government must prove that they knew BitMEX was a futures commission merchant, knew that it was required to register with the CFTC, and knew that "because it was a futures commission merchant, BitMEX was a financial institution under the BSA and was therefore required to establish and maintain an anti-money laundering program." Dkt. No. 209, at 27. That would be the equivalent of a holding in *Ratzlaf* that the Government had to prove not only that the defendant knew that his structuring was illegal, but also that he knew his obligation to avoid structuring was due to the bank's status as an "insured bank as defined in section 3(h) of the Federal Deposit Insurance Act." *See* 31 U.S.C. § 5312(2)(A). Needless to say, neither the Supreme Court nor any other court has imposed such a preposterous requirement. The willfulness element requires proof of knowledge of the actual legal duty, but does not require proof that the defendant knew all the intricacies of the regulatory scheme by which that duty arises. *See Cheek v. United States*, 498 U.S. 192, 202 (1991) ("[I]f the Government proves actual knowledge of the pertinent legal duty, the prosecution, without more, has satisfied the knowledge component of the willfulness requirement."); *see also United States v. Mousavi*, 604 F.3d 1084, 1092 (9th Cir. 2010) (describing that in *Ratzlaf*, "the government did not have to prove that the defendant was aware of the provision of the federal statute that made it illegal to structure his cash deposits to avoid triggering the bank's reporting obligation.").

An additional flaw in the defendants' proposed instruction is their request to instruct the jury that the purpose of the willfulness requirement is "to avoid the danger of ensnaring individuals in apparently innocent conduct." That language does not assist the jury in its factfinding role, and is solely requested by the defendants in order to improperly suggest that their conduct was "apparently innocent." The defendants' only response to this point is to say that this language was "drawn directly from the case law," citing *Ratzlaf*. Dkt. No. 243, at 13. But the mere fact that language is used by a court in the course of its reasoning does not mean that it should be included in jury instructions. For instance, the Supreme Court also explained that Congress enacted the Bank Secrecy Act "in response to increasing use of banks and other institutions as financial intermediaries by persons engaged in criminal activity." *Ratzlaf*, 510 U.S. at 138. But the Government does not believe this language would be appropriate to include in the jury instructions, even though it would favor the Government to do so. The defendants' proposed language about

"apparently innocent conduct" carries a clear risk of prejudice, and they do not cite any prior case in which their requested language has been included in the jury charge.

      E.   <u>Conscious Avoidance Instruction</u>

      The defendants acknowledge that a conscious avoidance instruction will be warranted if there is a factual predicate for the instruction laid at trial. They take issue with some of the language in the Government's proposed instruction, but the Government acknowledges that this is a general instruction that will need to be tailored to cover any particular facts that the trial evidence indicates the defendants consciously avoided knowing. For instance, the Government expects that the evidence at trial is likely to support an instruction regarding the defendants' conscious avoidance of the fact that BitMEX had United States customers, and a reference to that fact can be inserted into the Government's proposed instruction in accordance with the proof at trial. The Court cannot currently determine whether this instruction will be warranted or the precise wording that will be appropriate.

      Respectfully submitted,

      DAMIAN WILLIAMS
      United States Attorney

By:     <u>   s/ Thane Rehn          </u>
         Samuel L. Raymond
         Jessica Greenwood
         Thane Rehn
         Assistant United States Attorneys
         (212) 637-2354

cc:    Defense counsel