UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ARTHUR HAYES, BENJAMIN DELO,
SAMUEL REED and GREGORY DWYER,

*Defendants*.

20 Cr. 500 (JGK)

## **DEFENDANT BENJAMIN DELO'S SENTENCING MEMORANDUM**

FOLEY HOAG LLP

Harlan A. Levy
1301 Avenue of the Americas
New York, New York 10019
(646) 927-5500

SMITH VILLAZOR LLP

Patrick J. Smith
Andrew J. Rodgers
Selbie L. Jason
250 West 55th Street, 30th Floor
New York, New York, 10019
(212) 582-4400

*Attorneys for Defendant Benjamin Delo*

Dated: June 1, 2022

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  PROCEDURAL HISTORY OF THE CRIMINAL AND
     REGULATORY PROCEEDINGS ........................................................................ 3

     A.   The Indictment and Guilty Plea ............................................................ 3

     B.   Settlement of Parallel Regulatory Proceedings ..................................... 5

III. BEN'S PERSONAL HISTORY AND CIRCUMSTANCES ............................ 6

     A.   Ben's Childhood and Early Education ................................................... 6

     B.   Ben Attends the University of Oxford ................................................... 9

     C.   Ben's Career Before Co-Founding BitMEX ......................................... 9

     D.   The Founding and Evolution of BitMEX ............................................ 10

     E.   Ben's Commitment to Helping Others ................................................ 12

          i.    Ben's Commitment to Family ................................................... 13

          ii.   Ben's Commitment to His Community ..................................... 14

          iii.  Ben's Commitment to Philanthropy ......................................... 16

IV.  THE OFFENSE CONDUCT .............................................................................. 21

     A.   BitMEX Adopted Controls to Address Problematic U.S. Trading .................... 21

     B.   Ben's Role in the Offense Conduct ..................................................... 23

     C.   The Government's Exaggerated View of the Offense Conduct .......................... 26

     D.   Uncharged Conduct Should Not Be a Relevant Sentencing Consideration ........ 30

V.   A SENTENCE OF PROBATION IS APPROPRIATE .................................... 32

     A.   Federal Sentencing Framework ........................................................... 32

     B.   Ben Accepts the PSR's Advisory Guidelines Calculation ................................... 33

     C.   A Downward Variance from the Guideline Calculation Is Warranted
          Under 18 U.S.C. § 3553(a) ................................................................... 33

          i.    Ben's Personal History and Characteristics Weigh Heavily in
                Favor of a Downward Variance .................................................. 34

          ii.   The Nature and Circumstances of the Offense Merit a Downward
                Variance ..................................................................................... 35

          iii.  The Need to Avoid Unwarranted Sentencing Disparities and
                Promote Consistency in Sentencing Merit a Downward Variance ......... 36

          iv.   A Sentence of Probation Adequately Considers the Sentencing
                Objectives in 18 U.S.C. § 3553(a)(2) ....................................... 41

VI.  CONCLUSION ................................................................................................... 43

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Criminal Compl.*,
  2022 WL 1573361 (D.D.C. May 13, 2022)..................................................... 29

*Kimbrough v. United States*,
  552 U.S. 85 (2007)............................................................................. 32

*Matter of Search of Multiple Email Accts. Pursuant to 18 U.S.C. § 2703 for Investigation of
  Violation of 18 U.S.C.*, § 1956,
  2022 WL 406410 (D.D.C. Feb. 8, 2022) ........................................................ 29

*Rita v. United States*,
  551 U.S. 338 (2007)............................................................................. 35

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006)................................................... 34, 35

*United States v. Bulter*,
  2011 WL 4073672 (E.D.N.Y. Sept. 13, 2011) ........................................... 34

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008)............................................................ 32, 33

*United States v. Dorvee*,
  616 F.3d 174 (2d Cir. 2010)................................................................. 33

*United States v. Faiella*,
  2008 WL 4862455 (E.D.N.Y. Sept. 8, 2008) ............................................. 42

*United States v. Gardellini*,
  545 F.3d 1089 (D.C. Cir. 2008)............................................................. 41

*United States v. Hoskins*,
  902 F.3d 69 (2d Cir. 2018).................................................................. 31

*United States v. Jones*,
  460 F.3d 191 (2d Cir. 2006)................................................................. 33

*United States v. Leitch*,
  2013 WL 753445 (E.D.N.Y. Feb. 28, 2013)............................................... 41

*United States v. Nesbeth*,
  188 F. Supp. 3d 179 (E.D.N.Y. 2016) .................................................... 42

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009) ................................................................... 42

*United States v. Thavaraja*,
   740 F.3d 253 (2d Cir. 2014) ................................................................. 37

*United States v. Vigil*,
   476 F. Supp. 2d 1231 (D.N.M. 2007) ................................................... 43

*United States v. Zarrab*,
   2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) ....................................... 31

**Statutes**

18 U.S.C. § 371 ............................................................................................ 3

18 U.S.C. § 3553 ................................................................................. passim

18 U.S.C. § 3583 ........................................................................................ 33

31 U.S.C. § 5311 .......................................................................................... 3

31 U.S.C. § 5318 ................................................................................. passim

31 U.S.C. § 5322 ........................................................................................ 27

**Regulations**

31 C.F.R. § 1020.210 ................................................................................ 30

31 C.F.R. § 560.215 .................................................................................. 31

31 C.F.R. § 560.314 .................................................................................. 31

**Other Authorities**

Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n,
   *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*,
   https://www.ussc.gov/sites/default/files/ pdf/research-and-publications/research-
   publications/2017/20170309_Recidivism-CH.pdf ................................ 43

U.S. Dep't of Justice, Fed. Bureau of Prisons,
   *Inmate Security Designation and Custody Classification*,
   https://www.bop.gov/policy/progstat/5100_008cn.pdf ......................... 37

We respectfully submit this sentencing memorandum on behalf of Ben Delo, who is scheduled to be sentenced on June 15, 2022.

## I.  PRELIMINARY STATEMENT

At the center of this case, the parties are in complete agreement.  Ben Delo willfully violated the Bank Secrecy Act ("BSA") by operating BitMEX without BSA-compliant anti-money laundering ("AML") and know-your-customer ("KYC") programs.  Ben stood before the Court on February 24, 2022 and freely and candidly admitted this conduct:  He did not ensure that U.S. persons were completely restricted from BitMEX and, knowing U.S. persons were present, failed to ensure that BitMEX had the required AML and KYC policies.

For reasons that are not entirely clear, the government has sought to overstate the seriousness of the offense.  The government has advanced a narrative of a preplanned effort to violate the BSA as a central aspect of BitMEX's business model.  The government has further sought to engraft elements of monetary gain and fraud onto the offense.  And the government urges the Court to rely on uncharged (and unproven) conduct as a factor to support a harsher sentence.  In sentencing co-defendant Arthur Hayes, the Court observed that there was nothing "anomalous" about a stipulated sentencing range that fit the crime the government charged and to which the defendant pled.  (05/20/2022 Hayes Sentencing Hr'g Tr. at 44:5-8.)  The Court appropriately rebuffed the government's attempt to dress up this BSA offense as something more than it is:  A serious offense that increased the risk of potential money laundering activity, but was not itself money laundering or fraud.

The manner in which Ben committed the offense is of course a principal factor for the Court to consider.  This is not an aggravated BSA violation.  Rather, there are compelling

mitigating circumstances that help justify Probation's thoughtful recommendation of a sentence

of probation, including:

- Ben's principal responsibilities at BitMEX were the design and operation of the "trading engine," the automated order-matching functionality at the core of the platform.

- Ben had no responsibility for marketing or business development. There is no credible argument that he encouraged U.S. users to violate BitMEX's terms of service and trade on the platform.

- Ben personally, in hundreds of customer service interactions, banned users who presented a U.S. nexus.

- In co-founding BitMEX, an offshore trading platform, Ben did not set out to violate the BSA. He improved controls over time to deter and remove U.S. users. The violation took place when he did not do enough, upon learning that U.S. users were in fact trading on BitMEX, to either completely and effectively ban U.S. persons or to cause BitMEX to adopt an adequate AML policy.

- And while insufficient from a BSA perspective, Ben and BitMEX took steps to thwart money laundering, including marking all BitMEX blockchain transactions with the "3BMEX" prefix to readily identify transactions as BitMEX-related. There is no evidence that Ben ever encouraged bad actors to use BitMEX for unlawful purposes.

The purported aggravating factors that the government identified as to co-defendant

Mr. Hayes are absent in Ben's case. Ben was not responsible for legal or compliance policy at

any time. Mr. Hayes was the public face of BitMEX and was in charge of BitMEX's marketing

efforts. Ben did not participate in media appearances or author blog posts that could fairly be

construed as showing disdain for U.S. regulation. Even disregarding, as we should, the

government's caustic rhetoric directed at Mr. Hayes, given the circumstances of the offense and

Ben's role at BitMEX, he is meaningfully less culpable than Mr. Hayes, whom the Court

sentenced to the minimum Zone B sentence.

Perhaps more importantly, Ben's personal history and circumstances present a

compelling basis for leniency. Ben has overcome very serious early childhood challenges to

become a truly wonderful human being.  Ben has demonstrated a lifelong commitment to helping others.  He is fundamentally a caring and generous person with a passion for solving problems that face humankind.

The government wishes to make this into a case about greed and financial motive.  But Ben signed up to give away the majority of his wealth long before there was any hint of an investigation of BitMEX.  Indeed, he was well on his way to doing so, having made substantial gifts in 2018 and later committing to the Buffet/Gates Giving Pledge.  For Ben, the wealth that the success of BitMEX generates is a means to a truly worthwhile end.  Since October 1, 2020, Ben's main concern has been how this case will affect his ability to achieve the philanthropic goals he has set for himself.  It speaks volumes about this man that he is just as concerned about the damage to his ability to help others than the actual effects of the sentence on him.

We respectfully submit that Probation's recommendation gets it right.  A sentence of probation to be served while Ben resides in his country of residence is appropriate in this case.

## II. PROCEDURAL HISTORY OF THE CRIMINAL AND REGULATORY PROCEEDINGS

### A. The Indictment and Guilty Plea

On September 21, 2020, a federal grand jury in the Southern District of New York indicted Ben, along with co-defendants Arthur Hayes, Sam Reed, and Greg Dwyer, with one count of violating the BSA, 31 U.S.C. § 5311, *et seq.*; and one count of conspiracy to violate the BSA, 18 U.S.C. § 371.

The Indictment alleged that Ben, along with co-defendants Arthur Hayes and Sam Reed, co-founded BitMEX, an online trading platform that solicited and accepted orders for trades in futures contracts and other derivative products tied to the value of cryptocurrencies, including Bitcoin.  (Indictment ¶ 1.)  BitMEX was owned and operated through an entity registered in the

Seychelles. (*Id.* ¶ 10.)  Ben was BitMEX's Chief Operations Officer and Chief Strategy Officer. (*Id.* ¶ 12.)  In his role at BitMEX, Ben was responsible for developing and overseeing the trading engine, which matched orders submitted on BitMEX's platform.

The charges in the Indictment stem from BitMEX's failure to implement AML and KYC programs that complied with the requirements of the BSA.  (*Id.* ¶¶ 4, 8.)  The Indictment alleged that Ben understood by September 2015, based on Commodity Futures Trading Commission ("CFTC") enforcement orders, which clarified the status of cryptocurrencies under the Commodity Exchange Act ("CEA"), that BitMEX was required to implement BSA-compliant AML and KYC programs if BitMEX served U.S. customers or operated in the United States. (*Id.* ¶¶ 21, 25.)  In response to the CFTC orders, the Indictment alleged that BitMEX announced that it was withdrawing from the U.S. market.  (*Id.* ¶¶ 2, 28.)  Despite withdrawing from the U.S. market, the Indictment alleged that defendants, including Ben, "encouraged or allowed BitMEX to be accessed and used by U.S. customers" and "failed to take steps to effectively restrict U.S. customers from accessing BitMEX."  (*Id.* ¶¶ 22, 25.)

On February 18, 2022, Ben entered into a plea agreement with the government.  Pursuant to the terms of the plea agreement, Ben agreed to plead guilty to causing BitMEX to violate the BSA (Count One) and pay a fine in the amount of $10 million, subject to a reduction for civil penalties paid to the CFTC prior to the date of sentencing.

On February 24, 2022, the Court held a change of plea hearing.  (02/24/2022 Delo Plea Hr'g Tr. at 24:9-25:25.)  At the hearing, Ben acknowledged that he co-founded BitMEX, which offered futures products based on cryptocurrencies such as Bitcoin.  (*Id.* at 17:16-20.)  Ben admitted that, despite the "no-U.S. user policy," he understood that U.S. users found their way on to BitMEX, and that, even though he would regularly find U.S. users on the platform and

remove them, "U.S. users were still present." (*Id.* at 17:21-25.)  Ben also admitted that, in June

2018 when BitMEX began tracking and logging U.S. internet protocol ("IP") addresses at login,

BitMEX "did not immediately act to restrict trading for this set of known U.S. users." (*Id.* at

18:1-3.)

Ben understood that if BitMEX "had U.S. users on the platform who were actively

trading," then BitMEX would be deemed to be "in the U.S. for regulatory purposes." (*Id.* at

18:3-5.)  He also understood that "being in the U.S. meant that BitMEX was supposed to have a

customer identification program, also known as 'know your customer' or 'KYC'" and that, prior

to September 2020, BitMEX did not have such a program. (*Id.* at 18:5-9.)  Ben admitted that

BitMEX "did not have a formal, comprehensive AML program and BitMEX did not file

suspicious activity reports with the U.S. regulators." (*Id.* at 18:10-12.)  Ben continued to

participate in BitMEX's operations "[d]espite knowing about the presence of U.S. users and a

legal requirement to have a customer identification program." (*Id.* at 18:15-17.)

The Court accepted Ben's guilty plea and adjudged him guilty of the offence of violating

the BSA. (*Id.* at 25:8-15.)  The Court scheduled Ben's sentencing hearing for June 15, 2022.

(*Id.* at 26:2-6.)

### B.    Settlement of Parallel Regulatory Proceedings

On the same day that the Indictment was unsealed, the CFTC filed a parallel civil

enforcement action against Ben, his two co-founders, and the entities that comprise BitMEX.

*See* Compl., *CFTC v. HDR Glob. Trading Ltd.*, 1:20-cv-08132-LTS (S.D.N.Y. Oct. 1, 2020),

ECF No. 1.  The CFTC alleged control person claims against Ben based on allegations that

BitMEX failed to register with the CFTC in several capacities under the CEA, including the

failure to register as a futures commission merchant.

On August 10, 2021, HDR Global Trading Limited, and the other entities associated with BitMEX and named as defendants, settled the CFTC action and agreed to pay a $100 million civil monetary penalty. *See* Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief, *CFTC v. HDR Glob. Trading Ltd.*, 1:20-cv-08132-LTS (S.D.N.Y. Aug. 10, 2020), ECF No. 62. Of the $100 million civil monetary penalty, $50 million was paid to the CFTC and the remaining $50 million was offset by payments made pursuant to the Consent to the Assessment of Civil Monetary Penalty entered by the Financial Crimes Enforcement Network ("FinCEN").

On May 5, 2022, the court in the CFTC action approved a no-admit-no-deny settlement between Ben and the CFTC. *See* Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Defendant Benjamin Delo, *CFTC v. HDR Global Trading Limited*, 1:20-cv-08132-LTS (S.D.N.Y. May 5, 2022), ECF No. 90. As part of the settlement, Ben has paid a $10 million civil monetary penalty. (Ex. A (proof of payment of CFTC civil monetary penalty).) Under the terms of Ben's plea agreement, the $10 million civil monetary penalty paid to the CFTC reduces the stipulated $10 million fine in this case. In total, as a 30% owner of BitMEX, Ben has funded or directly paid over $40 million in regulatory penalties to U.S. authorities.

## III. BEN'S PERSONAL HISTORY AND CIRCUMSTANCES

### A. Ben's Childhood and Early Education

███████████████████████████████████████████. (PSR ¶ 84.)

███████████████████████████████████████████. (*Id.*) ███

███████████████████████████████████. Ben's family is supportive of him and they remain close. He does not have any family members in the United States.

A defining aspect of Ben's life is that he was born with Asperger's syndrome, an autism

spectrum disorder. ██████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████[1]

"It wasn't until [Ben] got the diagnosis of Asperger syndrome, at the age of eleven, that [they] could understand where he was coming from." (*Id.*) Once his family "had a[n] explanation, [they] were able to modify [their] reactions to help him." (*Id.*)

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

Following his diagnosis, Ben enrolled at the ████████████████████████, Oxfordshire. Attending school in Oxfordshire presented an excellent opportunity for Ben because Oxfordshire was a leader in the United Kingdom in services for autistic children and families. This was largely a result of the work of a teacher ████████████████, who had developed a model for integrating autistic children into mainstream schools. ████████████ adopted this model and created a "Resource Base" for children in the program, ████████████ ████████████████████████████████████████.

As his teachers at ████████████ attest, Ben thrived in this environment. Ben's ██████

---

[1] Letters provided by Ben's family and friends in support of this sentencing submission are attached as Exhibit B.

████████████████████████, recalls that Ben "was always bright and lively, adventurous, but with a sense of humor." (Ex. B at 9 (██████████.).) At an early age, Ben "had a great sense of justice and showed empathy to his peers." (*Id.*) With the assistance of the Resource Base ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ describes how Ben, despite his diagnosis, "was . . . good company [and] . . . sociable, with an optimistic outlook to help him glide through life's difficulties." (Ex. B at 11 (████████.).) He demonstrated an "interest in helping others" and became a mentor to other children at the ██████████ Resource Base. (*Id.*) Ben's interest in helping others became a core principle in his life.

With appropriate support, Ben thrived academically. Ben completed his A-Levels—the U.K.'s university entrance requirements—receiving four As (the highest designation) in Mathematics, Further Mathematics, Physics, and Chemistry, and gained admission to Worcester College at the University of Oxford.

██████████████████████████████████, and to this day is grateful to the extraordinary team of people that assisted him at ██████████████. Ben returns regularly to ██████████████ to speak with students and staff, and as discussed further in this submission, has donated to the school's Learning Resource Centre and helped establish the school's development office. ██████████████████████████, observes that "Ben was always kind and generous with others" and "wanted to help other children and young people with Autistic Spectrum Conditions by funding projects so they could benefit from the type of help he received." (*Id.*)

## B. Ben Attends the University of Oxford

In 2002, Ben began his studies at the University of Oxford's Worcester College. Simply put, Ben was an extraordinary student. He double majored in math and computer science, and earned a double first, graduating with a perfect GPA in both subjects. ███████████ ███ recalls that Ben was a "remarkable undergraduate" and "among the liveliest and cleverest of a very lively and clever cohort of Mathematics and Computer Science students—and a long way from the 'geekish' introversion people might expect of someone on the autistic spectrum." (Ex. B at 13 (███████████).)

While at Oxford, Ben joined IBM's elite Extreme Blue internship program as a lead software developer. Ben was part of a team that devised a prototype for software designed to fix broken or old web address links, called URLs. As quoted in a *New York Times* article about the project, Ben "was attracted by the difficulties of designing complex algorithms to determine the degree of change in a link, the significance of this change and the best ways to search for missing links." Anne Eisenberg, *For Missing Web Pages, a Department of Lost and Found*, The New York Times, Oct. 21, 2004, https://www.nytimes.com/2004/10/21/technology/circuits/for-missing-web-pages-a-department-of-lost-and-found.html%20. The technology was groundbreaking because it allowed companies to monitor the content of their website and ensure that links connected to intended content. This was the first glimpse of Ben's passion and commitment to complex problem solving, which he would put to use in his career and, later, his philanthropy.

## C. Ben's Career Before Co-Founding BitMEX

After graduating in 2005, Ben began his career as a software engineer at IBM. In 2007, Ben moved into the development of high-frequency trading systems at hedge funds and banks, including GSA Capital, Peel Hunt, and J.P. Morgan. At GSA Capital, Ben was responsible for

research, development, operation and ongoing improvement, monitoring, and maintenance of algorithmic execution strategies for several research groups in the hedge fund. In 2010, after three years at GSA Capital, Ben moved to Peel Hunt where he made a successful business case to deploy kdb+, a column-based relational timeseries database typically used in high-frequency trading to store, analyze, and retrieve large datasets at high speed. Ben's kdb+ expertise would become central to the successful design and implementation of BitMEX's trading engine.

██████████████████ notes that "[f]rom the outset Ben was ambitious, creative and hardworking." (Ex. B at 16 (█████████).) "He quickly understood [the company's] market positioning and presented ideas of how to automate and improve processes many of which are still in use today." (*Id.*) In fact, "[i]n a matter of months [Ben] . . . built an extensive framework for collecting market and trade data which was . . . used to provide pre- and post-trade insights, evaluate trading strategies and improve existing processes." (*Id.*)

In 2012, Ben moved from the United Kingdom to Hong Kong to accept a position at J.P. Morgan as Vice President in Electronic Trading Technology. In his role, Ben was responsible for the design, architecture, and implementation of a multi-day historic back-tester and analytics in order to develop and calibrate an algorithm that traded an index arbitrage strategy.

### D.    The Founding and Evolution of BitMEX

While working for J.P. Morgan, Ben met Arthur Hayes, who was an experienced derivatives trader and a devotee of cryptocurrency. Mr. Hayes had the idea to start a cryptocurrency derivatives exchange and was looking for potential partners. Along with fellow co-founder, Sam Reed, they would go on to found BitMEX.

BitMEX is a quintessential tech start-up story. In 2014, Arthur Hayes, Sam Reed, and Ben were three young entrepreneurs in their twenties, all living in Hong Kong. At the time, Ben was still working as a computer programmer in J.P. Morgan's Hong Kong office. ████

████████████████████████████████████████████████.  While Mr. Hayes had the idea for a crypto-product derivatives exchange, he did not have the technical ability to design and build a modern online trading platform.  Ben's kdb+ programming expertise, his experience with building trading systems, and his understanding of financial products were a perfect fit for the role of coder to build out the trading engine for BitMEX.  Later, Mr. Hayes met Mr. Reed, who had the skillset to build the frontend of the platform (the website and customer interface).  Between them, Ben and Mr. Reed brought the technical know-how to the table.  Mr. Hayes—one-part visionary, one-part carnival barker, and one-part businessman—was the leader among the co-founders and brought the rest.  The three young men set out to build BitMEX without any outside assistance and even used their own credit cards to fund operations and maintained multiple jobs to execute on their shared vision of creating the world's first Bitcoin derivatives exchange.

Following BitMEX's launch in November 2014, trading volume was low and profits were nonexistent.  Throughout much of 2015 and into 2016, the business faced a series of challenges and continued to operate on a shoestring budget.  However, by the spring of 2017, the decision to focus on the Asia markets and on retail customers began to pay off.  Trading volume steadily increased, with an influx of new users attracted to BitMEX, which had built the most innovative, robust, professional, and secure cryptocurrency trading platform in the industry.  BitMEX users traded with the confidence that the Bitcoin they deposited to support their trading was safe and secure—because it was:  BitMEX has never been hacked and has never missed a withdrawal.  The platform's flagship "perpetual swap"—which Ben designed—became the most traded cryptocurrency derivatives product of all time, with over $3 trillion in total volume on BitMEX alone.  *Five Years Ago, the Perpetual Swap Was Born.  Everything Changed*, BitMEX

(May 14, 2021), https://blog.bitmex.com/five-years-ago-the-perpetual-swap-was-born-everything-changed/.   From its direct access model to its self-clearing mechanism backed by an insurance fund, BitMEX's combining of novel product offerings and services made it the cryptocurrency derivative industry leader.

The extreme technical complexity and difficulty to implement and execute new, innovative products and services cannot be overstated.  And these extraordinary financial and technological innovations did not come without personal sacrifices.  Indeed, Ben kept his "day job" at J.P. Morgan until August 2015, and to cover rent during the development period, Ben listed his apartment's spare bedrooms on Airbnb.  He also spent countless hours in coffee shops, at dinner writing on the back of napkins, and in his apartment working on the mathematics and trading engine mechanisms.

When BitMEX eventually gained traction, the increased volume sometimes overwhelmed the trading engine and on occasions brought down the entire BitMEX platform.  Ben spent his days and nights improving the performance of the engine to match the exponential growth of the trading volume. ████████████████████████████████████████ ████████████ After expanding the engine team and handing over responsibilities, he took a five-month sabbatical in 2019, during which time he indulged in his favorite hobby—mathematics—and published a paper on mathematics research and numbers theory.  (PSR ¶ 95.)

### E.    Ben's Commitment to Helping Others

Ben's academic and professional achievements are a reflection of Ben's hard work, intellect, and dedication.  But there is another side of Ben beyond academic and professional success.  As the letters provided in support of Ben illustrate, Ben is a humble and conscientious person with a deep commitment to family, community, and philanthropy.  We address each of these areas, in turn, below.

### i. Ben's Commitment to Family

Ben's family all reflect on how important Ben is to them and how he has given back to the loved ones who helped him in his difficult early years. ███████████ relays that she "cannot emphasise enough how important Ben's family is to him" and that he ███████████ ███████████ and recognizes that his family was always there for him." (Ex. B at 4 (████████).) ███████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ███████████

Similarly, ███████████ underscores that "Ben is very caring and generous to his extended family," ████████████████████████████████ ████████████████████████. (Ex. B at 7-8 (████████).) ███████████████ ███████████ writes that family comes "[f]irst" for Ben, and despite being oceans and continents apart at times, Ben "rarely misses family gatherings" and he is "devoted to his immediate family, his wife, his parents, siblings and grandparents," as well as "his cousins, aunts and uncles." (Ex. B at 17-18 (████████).)

Ben's friends share his family's sentiment. ███████████ writes that she has "always been impressed by the emphasis Ben places on family values." (Ex. B at 19 (████████ ███).) He "will always make sure he has time for his parents and ███ siblings" and "enjoys spending time with them . . . even when he is on the other side of the world." (*Id.*) Ben "looks out for, and after, █████████████, often providing support to them in times of need." (*Id.*) And ████████████████████████████████████████████, writes that Ben "is tender to his wife, loving with his family, loyal to his friends and alma mater, and a pillar of his community." (Ex. B at 20 (████████).)

[REDACTED]

### ii. Ben's Commitment to His Community

Equally important to Ben is giving back to the community where he lives. At every step of his life, Ben has given what he could to those around him. [REDACTED]

[REDACTED]

[REDACTED]. (Ex. B at 16 ([REDACTED].).) In Hong Kong, [REDACTED] and participated in the

organization's initiatives to promote democracy, rule of law, tolerance, and diversity. (Ex. B at 22-23 (███████).) He also assisted with fundraising and hosted events free-of-charge at BitMEX's offices. (*Id.*) Indeed, others observed that Ben was "a generous donor . . . , being a long-term supporter of Commonwealth values, including sustainable development, equality of opportunity and the rule of law." (Ex. B at 24 (███████).)

Ben also seeks to help those less fortunate in times of need. For example, he has made 100 anonymous donations ███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ The responses to these small gifts, which were not shared with Ben, are profound and show the impact a few thousand pounds had on the lives of those who received the funds. (*Id.*) ████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████

There is perhaps no better illustration of Ben's passion and desire to help those around him than Ben's recent experience in Bermuda, where he is residing as a condition of his bail. In the time that he has been living in Bermuda, █████████████████████ immediately reached out "asking what he could do to help the local community." (Ex. B at 29 (███████).) Because of Ben's "selfless donation of time and funds," a medical clinic in Bermuda was "able to create a multitude of videos, news announcements, and public seminars that educated the public and gave them choice in a non-threatening and digestible manner." (*Id.*) "[T]hese concerted efforts" allowed the clinic to "recruit enough physician support to boost [Covid-19]

vaccination from 30% to 60% in just six months." (*Id.*) Additionally, Ben has become friends

with ███████████████████████████████████████████████████████

███████ reports that Ben has sponsored ████████████████████████████

████████████████████████████████████████. (Ex. B at 31

(████████).) These selfless, and in some respects small, acts demonstrate who Ben is as a

person and compliment his larger philanthropic vision.

### iii. Ben's Commitment to Philanthropy

One overarching theme in the letters provided in support of Ben is his deep commitment

to philanthropic causes. It is not hyperbolic to say that Ben's philanthropy in a short period of

time is truly remarkable. Following the success of BitMEX, ███████████████

█████████████████████████████████████, Ben committed

himself to helping others and giving back to society. ██████████████████

███████████████████████████████████████████████████

███████████████████████████████████.

In May 2018, after Ben received his first dividend payment from BitMEX, he began

making charitable donations to the schools that had helped him deal with the impact of his

autism spectrum disorder. In recognizing the immeasurable aid and assistance he had received

during his formative years, Ben's first gifts were to his secondary school—████████████—

where he donated £250,000 to fund various capital projects. ██████████████ recalls

that, in July 2018, Ben returned to visit the school to "catch up with some of his former

teachers." (Ex. B at 32 (████████).) Ben was interested in the financial situation of the

school and "was keen to make philanthropic donations to causes close to his heart." (*Id.*) Ben

"expressed his interest in developing a long-term relationship with the school, but nothing formal

was discussed." (*Id.*) "A few days later, Ben made a donation of £250,000." (*Id.*) Not only did

Ben lend financial assistance, "he gave his time generously and spoke at school assemblies and at Career Guidance and fundraising events," "[h]e agreed to mentor a student who had faced similar challenges and had similar interests," and he "supported the work of the School Development Office in establishing a much more secure fundraising programme, focusing on the contribution that alumni could make." (*Id.* at 33.)

Later, in October 2018, Ben became the youngest major donor in Worcester College's 300-year history by making a £5,000,000 donation to fund two teaching followships for mathematics and computer science. (Ex. B at 13-14 (███████).) When Ben broached the idea of making the donation, ███████████ at Worcester College was "taken aback at the magnitude of the sums he was prepared to think about, but not at all surprised at his generosity." (*Id.* at 14.) According to ████████, Ben stated at the time of the donation that "Worcester College and the tutorial system gave me the world-class education that laid the path to my success. I am incredibly grateful and very fortunate to be able to support the College, ensuring it continues tutoring future generations." (*Id.*)

Then, in April 2019, Ben signed the Giving Pledge, which is a commitment started by Bill Gates and Warren Buffett to encourage the world's wealthiest individuals and families to dedicate the majority of their wealth to charitable causes. *See About the Giving Pledge*, The Giving Pledge, https://givingpledge.org/about (last visited June 1, 2022). In signing the Giving Pledge, Ben also took the unique step of announcing where he plans to direct his charitable contributions. In his letter signing the pledge, Ben explained:

> My ambition now is to do the most good possible with my wealth. To me, this means funding work to safeguard future generations and protect the long-term prospects of humanity. This includes mitigating risks that could spell the end of human endeavour or permanently curtail our potential. My approach is inspired by philosopher William MacAskill and the effective altruism movement, which promotes the use of reason and evidence when deciding how best to help others.

*Ben Delo: Pledge Letter*, The Giving Pledge (Apr. 15, 2019), https://givingpledge.org/pledger?pledgerId=383.

As Ben explained, his "primary" philanthropic focus is "on reducing global catastrophic risks and safeguarding future generations." Press Release, The Giving Pledge, *More than 200 Philanthropists Have Now Joined the Giving Pledge, Committing to Give at Least Half Their Wealth to Charitable Causes* (May 28, 2019), https://givingpledge.org/pressrelease?date=0 5.28.2019. This focus proved insightful as Ben made a series of donations in 2019 totaling over $250,000 to ███████████████████████████, which researches ways to mitigate and prevent catastrophic risks such as the now all-too-familiar Covid-19 pandemic. Following the emergence of Covid-19, Ben provided additional donations, as early as February 2020, to Covid-19 research and funded a grant to help test for new viruses. Other donations included:



In 2020, Ben started his signature philanthropy, the ███████████████, which he sought to endow with £7.5 million. ████████████████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████.

███████████████████████████████████████████████, reports that Ben funded the

Foundation's activities in 2021 and 2022 "to the extent that . . . more than 4,500 students were

supported through grants totaling £718,900 given to 140 schools and colleges."  (Ex. B at 34 (██

████████.).)  ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████, the Foundation is able to report concrete success stories

from teachers and students, who explain that the projects funded through the grants "have

literally changed these pupils' lives" and that "[t]he progress has been astounding for our young

people."  (*Id.*)

In total, over the last four years, Ben has donated over $41 million to charitable causes.

The number itself is impressive, but as those who know Ben can attest, Ben's philanthropic

passion is honestly held, as he has championed causes with humility and decency.  At his core,

Ben is a humble and decent person with a strong moral character and a desire to help others for

years to come.  Ben's family, friends, colleagues, and contemporaries have consistent things to

say about Ben in this regard:

- ███████████████████:  "Ben . . . has overcome some challenges to become the successful man that he is today.  He is very un-materialistic, still insisting on wearing old T-shirts, trousers and socks, all the same colour.  He enjoys nice meals and treating his friends.  He is a very trusting and loyal person and once Ben recognizes you as a friend he will always be there for you."  (Ex. B at 5.)

- ███████████████████████: "Ben is driven by trying to make a difference to society. ███████████████████████████████████ a loyal, caring and generous member of society." (Ex. B at 8.)

- ███████████████████████████████████: "A dedicated benefactor, [Ben] puts the needs of the recipients first, doing as much as he can to help us to fulfil his vision. ███████████████████████████████████████████ ███████████████████████████████████ (Ex. B at 35.)

- ███████████████████████████████████████████: "Ben's philanthropy is inspirational; as a role model he has encouraged other young people to excel. I am very proud of his achievements and the way he has turned out as a socially conscious business leader and member of society." (Ex. B at 10.)

- ███████████████████████████████: "His philanthropy is very inspirational and my colleagues and I at the Resource Base at ███████████████ are very proud of his many achievements. His interest and commitment to charitable and philanthropic causes is genuine and he is, after much hard work, in the position to help others across a broad spectrum of interests." (Ex. B at 11.)

- ███████████████████████████████████████: "I have considerable experience within the world of philanthropic fundraising and I can say with confidence that I have never encountered any other donor who makes such large commitments at such a young age, or indeed who moves so swiftly from pledge to fulfilment." (Ex. B at 36.)

- ███████████████████████████████████████: "When UK covid restriction law allowed he visited both myself and my family and encouraged us all to keep going through a very difficult time. I feel very proud of his achievements ███████ ███████████████████████. I've always found Ben [to be] an extremely honest, responsible and genuine person." (Ex. B at 37.)

- ███████████████████████████████████: "[Ben] is, above all, a man of integrity and compassion" who "combines a stunning intellect, including a remarkable and innovative business brain, with kindness, loyalty, compassion and a deep love for his wife and family." (Ex. B at 38.)

- ███████████████████████████████████████████████████
  ███████████ "Mr Delo is a young man with oodles of talent and skill, and I am convinced his intervention in social justice issues for now and for future generations is a plus to our business community." (Ex. B at 40.)

## IV. THE OFFENSE CONDUCT

The PSR's offense conduct section is drawn from one-sided material provided by the government and "various court documents." (PSR ¶ 10.) As noted in the PSR, defense counsel objected to the government's characterization of the offense conduct and provided a separate summary detailing the nature of the offense. Rather than resolve the parties' conflicting positions, the PSR has, for the most part, incorporated both parties' positions for the Court's review. (*Id.* at 34-47.) However, there are no disputed issues that bear on the stipulated Guidelines range. Below we set forth aspects of the offense conduct that are relevant to the Court's sentencing determination and address the government's distorted view of the nature of the offense.

### A. BitMEX Adopted Controls to Address Problematic U.S. Trading

Even though BitMEX's U.S. user policy and related controls were insufficient to prevent a BSA violation, the evolution of the controls and their partial effectiveness nonetheless present a mitigating circumstance in this case. Starting in September 2015, BitMEX implemented a U.S. user ban in response to the CFTC's announcement in two settled orders that cryptocurrencies were commodities under the CEA. BitMEX updated its terms of service to ban U.S. persons and required new users, as well as legacy users who wanted to deposit additional Bitcoin to trade, to declare their country of residence. To confirm the country of residence that users selected, BitMEX also implemented an IP address check. The IP address check was designed to detect users who tried to register for an account or deposit additional Bitcoin from the United States but selected a different country of residence.

There is also no dispute that BitMEX's controls developed over time and became more robust, especially in 2018 when the platform experienced significant growth. One of BitMEX's first steps, after retaining Sullivan & Cromwell in the spring of 2018, was to update its corporate

user policy. BitMEX had two types of users: retail and corporate. Retail users were individuals who traded with their own funds; corporate accounts were institutions that traded for a variety of reasons (hedging, investment, speculation, or market making). In May 2018, BitMEX contacted all known corporate accounts to remind them of BitMEX's policy, which restricted access to the platform for any U.S. person or U.S. operation. BitMEX granted limited access from the United States for back-office functions in order for compliance personnel to monitor trading positions. However, the corporate accounts had to sign an attestation confirming that neither the legal entity for which positions were held, nor the persons directing and controlling trading were located in the United States. BitMEX obtained good compliance with the policy, with some corporate accounts moving their trading function offshore or closing their accounts. Ben personally participated in policing this policy. (Ex. C (███████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████).)

BitMEX also strengthened its controls with respect to the location of accounts generally. In July 2018, BitMEX updated its controls to check whether customers, who registered for an account prior to September 2015, continued to trade on the platform with existing funds deposited prior to the U.S. user ban. Additionally, following a request in the spring of 2018 from regulators in Quebec that BitMEX stop offering its services in the province, BitMEX began to collect users' IP addresses at every login, not just at registration. In June 2018, BitMEX restricted access to users logging in from Quebec but did not immediately restrict all users who were logging in from a U.S. IP address despite having selected a non-U.S. country at registration.

In September 2018, Ben began to address the problem of users logging in from the United States. Within about a month, Ben had manually restricted all known U.S. accounts. In

addition, he supervised a project to move the platform to IP address checks at each login and automated account restriction upon login from the United States.  In this timeframe, Ben made the poor choice of delaying this automated control for U.S. logins to accommodate back-office and compliance logins for corporate accounts that had administrative functions in the United States.  Programmers addressed this issue, and on December 12, 2018, the new control went live.

In addition to developing these technical controls, Ben was also involved in the human controls through the customer support function.  Customer support personnel were trained to identify potential U.S. users.  By 2017, when a user presented a possible U.S. connection in a customer service interaction, customer service personnel followed a clear policy to restrict accounts where the user could not demonstrate a non-U.S. residency.   As the head of customer support explained, "███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████   There are thousands of customer support tickets showing this policy being enforced.

### B.    Ben's Role in the Offense Conduct

Ben was personally involved in identifying users suspected of circumventing BitMEX's U.S. user ban and removing them from the platform.  There are hundreds of examples of Ben restricting users determined to be in violation of BitMEX's U.S. user policy by either acting in a customer support role or supporting the customer support team.  (*See, e.g.*, Ex. E at US_00764844-845 (██████████████████████████████████████████████████

████████████████████████████████████████████████████████);

Ex. F at US_00176941 (███████████████████████████████████); Ex. G at

US_00176954 ███████████████████████████████████████); Ex. H at

US_00766070 (█████████████████████████████████████████████
█████████████████████████████).)

While the efforts to identify and restrict trading from the United States fell short of 100%

effectiveness, the controls improved over time and had a meaningful impact in reducing the

problematic usage by U.S. persons.  Expert analysis made available during discovery and

disclosed to the government showed that BitMEX, through controls developed and implemented

by Ben, turned away at least $109,842,340 in potential U.S.-based revenue.  (*See* Ex. I ¶¶ 7, 8(a)

(02/11/2022 Defs.' Updated Expert Disclosure).)

As reflected in Ben's guilty plea, the controls were admittedly not sufficient to identify

and remove all U.S. users.  Users were able to circumvent BitMEX's controls by using a virtual

private network ("VPN"), which allowed U.S.-based users to disguise their IP address to appear

to be logging in from another, permitted jurisdiction.  Additionally, BitMEX, and Ben, did not

act immediately in July 2018 to restrict all accounts that had been logging in from U.S. IP

addresses despite having a declared country from a jurisdiction that allowed BitMEX to operate.

Ben's guilty plea reflects that he knew that U.S. users found their way onto BitMEX, and that,

even though he would regularly find U.S. users on the platform and remove them, "U.S. users

were still present."  (Delo Plea Hr'g Tr. at 17:22-25.)  Ben also admitted that, in June 2018 when

BitMEX began tracking and logging U.S. IP addresses at login, BitMEX "did not immediately

act to restrict trading from this set of known U.S. users."  (*Id.* at 18:1-3.)

Without minimizing the seriousness of the admitted offense, it is appropriate to place in

context Ben's conduct and consider his primary responsibilities at BitMEX.  As alleged in the

Indictment, Ben was the Chief Operations Officer and, later, the Chief Strategy Officer.

(Indictment ¶ 12.)  His role was distinct from that of Mr. Hayes, who was the CEO and the face

of the organization as well as a prominent figure in the nascent cryptocurrency industry. From the outset, Mr. Hayes took responsibility for promoting and marketing BitMEX and took on the strategic decisions about where and how the business would operate. While Ben concurred in Mr. Hayes's decisions, he was focused on the task assigned to him—building a best-in-class trading engine that would permit safe, secure, and reliable trading in cryptocurrency derivative products.

The government has also maintained that Ben and BitMEX intentionally marketed to U.S. customers. (PSR ¶¶ 33-35.) That position is untenable in light of the available evidence. The head of marketing, who the government intended to call at trial, confirmed that Ben was not involved in the direction or supervision of BitMEX's marketing activities and that BitMEX did not run advertising campaigns, including search engine marketing through Google, targeting U.S. customers. (Ex. J at 7:15-21, 25:5-23, 27:17-28:19, 35:5-36:4, 37:17-39:3 (04/23/2019 ██ ██ CFTC Tr.).) And, when asked in Defendants' request for a Bill of Particulars for the evidence supporting the direct U.S. marketing allegations, the government identified documents showing that Mr. Hayes consistently and regularly informed viewers during television and other appearances that BitMEX did not accept U.S. persons as clients. (Ex. K (US_00789780).) ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ (PSR ¶ 34.) At bottom, there are no mentions of Ben's involvement in BitMEX's business development and marketing activities precisely because those functions

---

2 ████████████████████████████████████████████████████
████████████████████████████████████.

reported to others in the business and, ultimately, to Mr. Hayes.  That Ben understood that U.S. customers found their way past BitMEX controls is very different from actively soliciting U.S. customers, which Ben did not do and did not condone.  Ben's consistent customer service record banning U.S. users when they were found on BitMEX confirms this point.



### C.  The Government's Exaggerated View of the Offense Conduct

Ben takes full responsibility for his failure to cause BitMEX to adopt a BSA-compliant AML and KYC program after learning that U.S. customers were circumventing BitMEX's controls.  But the government's efforts to portray the offense conduct as somehow more serious or egregious are exaggerated and unpersuasive.

*First*, the government describes BitMEX as a criminal enterprise designed to profit from U.S. law violations.  (PSR ¶¶ 16, 18; *see also* Gov't Hayes Ltr. at 2-3, 11.)  The government cherry picks statements from BitMEX's website and early communications from 2014, none of which were authored by Ben, to suggest that BitMEX's *raison d'etre* was to profit from violating U.S. AML and KYC requirements.  (PSR ¶ 18.)  But those statements simply reflect the

contemporaneous understanding that, prior to the CFTC's enforcement orders in 2015, there was no government regulation covering Bitcoin-only exchanges and that no other similar exchanges that employed a crypto-only model had U.S.-compliant AML and KYC programs. (Ex. L at US_00017056.) The government has never cited any definitive authority that alerted BitMEX, much less Ben, that it was operating in violation of U.S. law prior to September 2015. Nor could they, as the Indictment affirmatively alleged that the status of cryptocurrencies was unsettled prior to the September 2015 CFTC orders. (Indictment ¶¶ 25, 28.)[3]

*Second*, the government has invoked various rhetorical flourishes to describe BitMEX's controls—claiming they were a "sham," "tissue-paper thin," and "designed to fail" or "be easily evaded." (Gov't Hayes Ltr. at 3; Ex. M at 3, 12 (Gov't Resp. to Delo PSR Objections).) BitMEX's controls, however, were real and had a measurable and significant impact on deterring unauthorized U.S. customers. BitMEX's records show that approximately ▮▮▮▮ users registered on BitMEX with a U.S. nexus and were never permitted to deposit and trade. (Ex. I ¶ 7 (Defs.' Updated Expert Disclosure).) Applying a reasonable estimate of the percentage of registered users from this group who would have converted to trading users as well as reasonable estimates on average revenue per customer indicates that BitMEX denied access to U.S. users that would have generated approximately $▮▮▮▮ in additional revenue. (*Id.*)

BitMEX's records also show the number of users who were active traders and had their accounts restricted *because of a U.S. nexus.* As disclosed pretrial, there were approximately

---

[3] The government's suggestion that BitMEX was a "criminal enterprise" is difficult to square with the actual offense to which Ben pled guilty, which does not involve any claims of deceptive or fraudulent practices. *See generally* 31 U.S.C. §§ 5318(h) & 5322. It also ignores the undisputed fact that, besides the problematic U.S. trading activity that BitMEX was unable to sufficiently address, the vast majority of the trading activity occurred in permitted jurisdictions and was not unlawful.

██████ such accounts restricted while in the middle of their trading life. (*Id.* ¶ 8.) Applying reasonable estimates on length of user engagement and average revenue per user indicates that the amount of revenue turned away from this group falls in a range of ████████████

████████. (*Id.* ¶ 8(a)-(c).) To be sure, these statistics are a mitigating circumstance and not a defense. But by any measure, $109,842,340 in revenue from potential U.S. users who were turned away by BitMEX's admittedly imperfect controls is significant. At a minimum, it shows that Ben was not hell-bent on breaking U.S. law for profit. For its part, the government has never quantified the scope of the problematic U.S.-based trading that actually occurred.[4]

*Third*, in the absence of any attempt to quantify the problematic trading activity from the U.S. that forms the basis of the underlying charge, the government relies on the counterfactual claim that Ben falsified records to permit U.S. trading activity. This claim, too, is against the weight of the evidence. Hundreds of customer service interactions show Ben repeatedly implementing the ban on U.S. trading activity by removing suspected U.S. users from the platform. *See supra* at 23-24.

The government relies on two examples where U.S.-based affiliates registered for accounts before BitMEX's ban on U.S. users and maintained active accounts to receive affiliate referral payouts. (PSR ¶¶ 24-27.) The first user, User-1, was only allowed to keep his account after ████████████████████████████████ and permitted User-1 to maintain his account

---

[4] Rather than address the scope of the offense conduct, the government criticizes BitMEX for not developing the technology to detect VPNs and, despite the lack of any guidance on the issue, points to measures implemented by Netflix to address VPN usage to circumvent geographical content restrictions. (Gov't Hayes Ltr. at 3 n.3; Ex. M at 8 (Gov't Resp. to Delo PSR Objections).) But there are countless examples in BitMEX's customer support tickets showing that Netfix's controls were far from foolproof because users would use U.S.-based VPNs to access Netflix and then attempt to trade on BitMEX only to get caught in BitMEX's, not Netflix's, controls. (*See, e.g.*, Ex. O at US_01776599 ███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████.)

after passing BitMEX's user verification program with a friend's Canadian identification. (Ex. N at US_0102314 (█████████████████████████████████ █████████████████████████████████████████████████████████████ █████████████████████████████).)  The second user, User-2, was removed from the platform once BitMEX discovered that he was instructing users online about how to circumvent BitMEX's controls.  Following User-2's removal, Ben reinforced BitMEX's policy by manually banning any affiliate with a country of residence in a restricted jurisdiction ███████████████████████████████████████████████████████████████ ███████████████████████████████ (Ex. P at US_01447395.)  These two isolated incidents do not reflect any rampant effort by Ben or BitMEX to obfuscate U.S.-based trading.

Finally, the government suggests, without any factual support, that BitMEX was a "magnet for criminals looking to launder the proceeds of their illegal activity and commit other crimes."  (Gov't Hayes Ltr. at 9.)  The mischaracterization of the BitMEX platform plays on outdated views of cryptocurrencies as inherently nefarious and providing "pseudonymity" to criminals.  (Id. at 11.)  Recent court decisions recognize that "virtual currency is traceable" and that "the myth of virtual currency's anonymity refuses to die."  See In re Criminal Compl., 2022 WL 1573361, at *4 (D.D.C. May 13, 2022) (citing Matter of Search of Multiple Email Accts. Pursuant to 18 U.S.C. § 2703 for Investigation of Violation of 18 U.S.C. § 1956, 2022 WL 406410, at *11-12 (D.D.C. Feb. 8, 2022)).  That a handful of potential criminals had accounts on BitMEX does not demonstrate that BitMEX was a haven for criminal activity or that Ben or BitMEX encouraged or enabled laundering of criminal proceeds.  The examples that the government cite show that private attorneys and government authorities reached out to BitMEX

29

(which had an excellent track record of cooperating with U.S. law enforcement inquiries) precisely because they were able to trace the proceeds to BitMEX. This is a direct result of actions that Ben and BitMEX took to ensure that every transaction to or from BitMEX included a "3BMEX" identifier thereby making it clear to anyone searching the immutable ledger (or blockchain) where proceeds were sent or received. This type of transparency, and the ability for law enforcement to contact BitMEX to pursue criminal activity, undercuts the claim that BitMEX, or Ben, facilitated criminal offenses or the laundering of criminal proceeds.

### D. Uncharged Conduct Should Not Be a Relevant Sentencing Consideration

The PSR includes references to uncharged conduct. (PSR ¶¶ 41-51.) We objected to the inclusion of uncharged conduct in the PSR because, as shown in government's sentencing submission in the case of Mr. Hayes, it is a transparent attempt to bootstrap sentencing factors applicable to other more-serious crimes to argue for an above-guidelines sentence. None of the alleged categories of uncharged conduct—namely, the alleged "Failure to File SARs," "Sanctioned Jurisdiction," and "Other Misrepresentations"—should be considered in connection with the Court's sentencing decision because they lack a factual basis or otherwise do not apply to Ben.

*First*, the failure to file SARs with U.S. authorities is already part of the BSA violation and not a freestanding consideration. *See* 31 C.F.R. § 1020.210(a)(v)(B) (articulating BSA requirement for futures commission merchants to "[c]onduct[] ongoing monitoring to identify and report suspicious transactions"). Ben acknowledges that BitMEX did not file SARs with FinCEN because BitMEX was not a U.S. company and had banned U.S. persons under BitMEX's terms of service. As the government concedes, BitMEX did file SARs in accordance with Seychelles law, and the failure to file contemporaneous reports with U.S. authorities is a

product of the failure to implement a BSA-compliant AML and KYC program in response to U.S. persons accessing the platform in violation of BitMEX's terms of service.

*Second*, as a British citizen who lived and worked outside the United States at all times, Ben was not subject to the International Emergency Economic Powers Act ("IEEPA"), which governs transactions with sanctioned jurisdictions. *See* 31 C.F.R. §§ 560.215, 560.314 (IEEPA prohibitions only apply to a "United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States"). Nor could Ben be said to have aided and abetted or conspired to violate IEEPA. *See United States v. Hoskins*, 902 F.3d 69, 97 (2d Cir. 2018) (aiding and abetting and conspiracy theories cannot be used to extend liability beyond the categories of persons who may be charged under a particular statute).[5]  It is also worth noting that BitMEX banned transactions with individuals in sanctioned jurisdictions, applying controls comparable to those prohibiting U.S. customers.

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

---

[5] The government citation to *United States v. Zarrab*, 2016 WL 6820737, at *10 (S.D.N.Y. Oct. 17, 2016) in response to Ben's objections to the draft PSR misses the mark. The court in *Zarrab* found that "the Indictment allege[d] a domestic nexus between Zarrab and his co-conspirators' conduct and the United States, i.e. the exportation of services from the United States." *Id.* at *8.  Ben was based in Hong Kong, and the government alleges that BitMEX offered and sold cryptocurrency products to the users in the United States, not that it exported services from the United States.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████.

## V.    A SENTENCE OF PROBATION IS APPROPRIATE

### A.    Federal Sentencing Framework

The "overarching" command of 18 U.S.C. § 3553(a) instructs district courts to "'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals." *Kimbrough v. United States*, 552 U.S. 85, 89 (2007).  While the Court is instructed to use the Guidelines as an initial benchmark, they can and should play no role in the sentencing decision when doing so would undermine federal sentencing objectives.  *Id.* at 90.

As the Second Circuit has explained, the Court "must form its own view of the 'nature and circumstances of the offense and the history and characteristics of the defendant.'" *United States v. Cavera*, 550 F.3d 180, 188-89 (2d Cir. 2008) (quoting 18 U.S.C. § 3553(a)(1)).  The sentencing judge is also directed to consider the factors set forth in 18 U.S.C. § 3553(a)(2), which include: (a) "the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense"; (b) "the need to afford adequate deterrence to criminal conduct"; (c) "the need to protect the public from further crimes by the defendant"; and (d) "the need for rehabilitation."  *Id.*   Additionally, district courts must take into account: the kinds of sentences available, *id.* § 3553(a)(3); any pertinent Sentencing Commission policy statements, *id.* § 3553(a)(5); the need to avoid unwarranted sentence disparities among similarly situated defendants, *id.* § 3553(a)(6); and, where applicable, the need to provide restitution to any victims of the offense, *id.* § 3553(a)(7).

In fashioning a just sentence, the Court must conduct its own "independent review of the

sentencing factors, aided by the arguments of the prosecution and defense" while also giving "consideration [to its] own sense of what is a fair and just sentence under all the circumstances." *See Cavera*, 550 F.3d at 189; *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). It is not the amount by which a sentence deviates from the applicable Guidelines range that is the measure of how "reasonable" a sentence is. *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010). Rather, "[r]easonableness is determined instead by the district court's individualized application of the statutory sentencing factors." *Id.* Application of these factors here strongly supports the PSR's recommendation of a probation-only sentence.

## B. Ben Accepts the PSR's Advisory Guidelines Calculation

Pursuant to the parties' plea agreement and the PSR, the offense level is as follows:

| | |
|---|---|
| 2B1.1(a) – Base Offense Level | 8 |
| 3B1.1(a) – Organizer or leader, 5 or more participants | 4 |
| 3E1.1(a) – Acceptance of responsibility | -2 |
| TOTAL OFFENSE LEVEL = | 10 |

Because Ben has no criminal convictions, his criminal history score is zero, which places him in Criminal History Category I. Accordingly, the applicable Zone B Guidelines range is 6 to 12 months in custody and a term of supervised release of 1 to 3 years. 18 U.S.C. § 3583(b)(2). The PSR also states that the maximum statutory fine is $250,000 and the fine range for this offense is from $4,000 to $40,000.

## C. A Downward Variance from the Guideline Calculation Is Warranted Under 18 U.S.C. § 3553(a)

Probation recognized that a downward variance was appropriate in this case and recommended a sentence of two-years' probation and a $10 million fine in accordance with the plea agreement. (PSR at 49, 50.) In formulating its sentencing recommendation, Probation

highlighted that Ben's actions did not cause a monetary loss to any specific victim and that Ben admitted that his efforts to implement controls to abide by U.S. law were ineffective. (*Id.* at 51.) Probation also took account of Ben's compliance with the terms of his pretrial release, his charitable contributions to society, his strong family support, and ████████████████ ██████████████████████. (*Id.*) We agree that a sentence of probation is appropriate and discuss below the reasons why the Court should impose a probationary sentence on Ben.

### i. Ben's Personal History and Characteristics Weigh Heavily in Favor of a Downward Variance

Ben is a talented computer scientist and mathematician who has overcome Asperger's syndrome to become the co-founder of a first-of-its-kind trading platform. What is revealing about Ben is his first reaction upon achieving professional success. He immediately sought to give away his wealth to help current and future generations. As the letters provided by friends and family show, Ben is a generous, caring, and humble person who seeks to give back to the people, communities, and institutions that supported him throughout his life. The letters from friends and family uniformly attest to Ben's giving spirit and positive contributions. *See United States v. Bulter*, 2011 WL 4073672, at *4 (E.D.N.Y. Sept. 13, 2011) (imposing non-Guideline sentence "in large part because defendant was 'supported by a large community of family and friends, . . . who have attested to his good character in written submissions to the court").

Ben's generous acts began well in advance of any allegations of wrongdoing by BitMEX, which reinforces the authenticity of Ben's generosity and philanthropic passion to address existential threats to humanity. (*See* Hayes Sentencing Hr'g Tr. at 55:4-12 (crediting co-defendant Hayes's "record of charitable contributions and community involvement that apparently preceded any involvement in the current prosecution").) At 38 years of age, Ben has the ability to make lasting contributions as he continues his philanthropic endeavors. *See United*

*States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (Rakoff, J.) ("[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'"); *see also Rita v. United States*, 551 U.S. 338, 364-65 (2007) (Stevens, J., concurring) ("Matters such as . . . charitable[] or public service are not ordinarily considered under the Guidelines [but are] matters that § 3553(a) authorize the sentencing judge to consider.").

A sentence that includes incarceration or home confinement would also result in personal hardship to Ben and his family that is disproportionate to the offense and unnecessary to achieve the objectives set forth in 18 U.S.C. § 3553(a).  Ben resides abroad and has limited friends and no family in the United States.  ███████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████████.

    ii.    **The Nature and Circumstances of the Offense Merit a Downward Variance**

There is no support for the notion that Ben, in co-founding BitMEX, had a plan to violate the BSA, for profit or otherwise.  Ben's focus was building and maintaining a trading engine that was capable of handling BitMEX's growing trading volume.  In 2018, Ben also worked on the front-end coding upgrades to improve the U.S. user controls.  These upgrades turned away

substantial incremental U.S. revenue.  However, during this time, Ben learned that U.S. users were present on BitMEX and that BitMEX needed to do more.  Ben's failure in the face of this known legal duty is the essence of the offense.

The Court appropriately rejected the government's effort to have Mr. Hayes sentenced on the basis of purported aggravating factors.  While these factors were largely meritless, they do not even apply to Ben ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████  The letters submitted in Ben's support attest to his belief in the rule of law and doing things the right way.  (Ex. B at 24 (██████ letter recognizing Ben as a long-term supporter of Commonwealth values including the "rule of law"); Ex. B at 3 (████████████████████████████████ ██████████████████████████).)  ███████████████████████████████████ █████████████████████████████████████.  There is nothing aggravated about either this BSA offense or Ben's role in it.

### iii. The Need to Avoid Unwarranted Sentencing Disparities and Promote Consistency in Sentencing Merit a Downward Variance

Several factors counsel strongly in favor of a probationary sentence.  Perhaps most importantly, Ben is not an American, has never worked in the United States, does not currently reside in the United States, ████████████████████████████████████████ ██████.  A custodial sentence would be unduly harsh because, as a non-citizen, ████████ ████████████████████████████████████████████████████████



. *See United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014) ("In determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, a district court may take into account the uncertainties presented by the prospect of removal proceedings."). Such disparate treatment of Ben based on his immigration status, which has nothing to do with the underlying offense, would be unjust and create an unwarranted sentencing disparity.

Sentencing Ben to a term of probation would also be consistent with how, prior to this case, the Department of Justice treated executives of companies accused of BSA violations. Simply put, the government has not criminally prosecuted executives of financial institutions on stand-alone BSA charges. Prior to this case, the government had brought a single civil enforcement action in *U.S. Department of Treasury v. Haider*, 14-cv-9987 (S.D.N.Y. 2014) against the former chief compliance officer of a money services business called MoneyGram for failing to implement an adequate AML program. The government sought to enforce a $1 million

civil penalty levied by FinCEN and ultimately settled for $250,000.  *See* Press Release, U.S.

Attorney's Office for the Southern District of New York, *Acting Manhattan U.S. Attorney*

*Announces Settlement of Bank Secrecy Act Suit Against Former Chief Compliance Officer at*

*MoneyGram for Failure to Implement and Maintain an Effective Anti-Money Laundering*

*Program and File Timely SARs* (May 4, 2017), https://www.justice.gov/usao-sdny/pr/acting-

manhattan-us-attorney-announces-settlement-bank-secrecy-act-suit-against-former.

Aside from *Haider* and this Court's sentencing of Mr. Hayes, we have found no other

reported cases of individuals being held personally responsible for stand-alone BSA violations as

the Department of Justice's longstanding practice has been to enter into settlements and deferred

prosecution agreements with the entities without charging individuals criminally.  A

representative sampling includes the following resolutions of willful violations of 31 U.S.C.

§ 5318(h) for failing to maintain a BSA-compliant AML program:

- Deferred Prosecution Agreement, *United States v. CommunityOne Bank, N.A.*, 11-cr-00122 (RJC) (W.D.N.C. Apr. 28, 2011), ECF Nos. 1 & 2 (uncontested criminal information, which included AML charge under 31 U.S.C. § 5318(h)(1) based on the failure to detect a "$40,000,000 Ponzi securities fraud and money laundering scheme");

- Deferred Prosecution Agreement, *United States v. ABN AMRO Bank N.V.*, 10-cr-00124 (CKK) (D.D.C. May 10, 2010), ECF No. 2-1 (admitting to two-count criminal information that contained a BSA violation under 31 U.S.C. § 5318(h) based on the bank's actions to circumvent sanctions and facilitate "the movement of hundreds of millions of dollars illegally through the U.S. financial system" on behalf of sanctioned entities);

- Plea & Forfeiture Agreement as to Elemetal, LLC, *United States v. Elemetal, LLC*, 18-cr-20173 (FAM) (S.D. Fla. Mar. 19, 2018), ECF Nos. 11 & 12 (admitting to BSA violation under 31 U.S.C. § 5318(h) based on, among other things, the precious metal dealer's acceptance of gold "from persons and entities without requesting or obtaining adequate, or in some instances any, identification and information regarding those persons or the source of their gold");

- Deferred Prosecution Agreement, *United States v. Wachovia Bank, N.A.*, 10-cr-20165 (JAL) (S.D. Fla. Mar. 16, 2010), ECF No. 13 (admitting to BSA violation under 31

U.S.C. § 5318(h) based on "serious and systemic" violations that "allowed certain Wachovia customers to launder millions of dollars of proceeds from the sale of illegal narcotics through Wachovia accounts over an extended time period");

- Deferred Prosecution Agreement, *United States v. U.S. Bancorp*, 18-cr-00150 (LAK) (S.D.N.Y. Feb. 12, 2018), https://www.justice.gov/usao-sdny/press-release/file/1035081/download (admitting to BSA violation under 31 U.S.C. § 5318(h) for "willfully failing to maintain an [AML] program" based on the bank's concealment of problematic practices from its primary regulator and failure to monitor, investigate, and report a substantial number of suspicious transactions flowing through the bank);

- Deferred Prosecution Agreement, *United States v. HSBC Bank USA, N.A.*, 12-cr-00763 (AMD) (E.D.N.Y. Dec. 11, 2012), ECF No. 3-2 & 3-3 (admitting to BSA violation under 31 U.S.C. § 5318(h) because the bank "ignored the money laundering risks associated with doing business with certain Mexican customers," which resulted in "at least $881 million in drug trafficking proceeds" being "laundered through HSBC . . . without being detected");

- Deferred Prosecution Agreement, *United States v. JPMorgan Chase Bank, N.A.*, 14-cr-00007 (PKC) (S.D.N.Y. Jan. 6, 2014), https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/JPMC%20DPA%20Packet%20%28Fully%20Executed%20w%20Exhibits%29%20-%20downloaded%20from%20online.pdf (admitting to BSA violation under 31 U.S.C. § 5318(h) for failing to maintain an effective anti-money laundering program in connection with the Bernie Madoff Ponzi scheme that was executed exclusively through accounts at J.P. Morgan);

- Deferred Prosecution Agreement, *United States v. Industrial Bank of Korea*, 20-cr-00257 (DLC) (S.D.N.Y. Apr. 27, 2020), ECF No. 5 (admitting to BSA violation under 31 U.S.C. § 5318(h) based on the bank's failure to "provide the resources, staffing, and training necessary to maintain an adequate AML program" "despite requests and admonitions from regulators and [the bank's] own compliance officer").

In addition to the novel prosecution of individual defendants on a BSA-only theory, the government also took the extraordinary step of seeking an above-guideline sentence for Mr. Hayes. It is unclear whether the government will take the same position for Ben given the Court's rejection of the government's request for an upward variance. (*See* Hayes Sentencing Hr'g. Tr. at 54:15-24 (observing that the government "chose not to accuse the defendant of money laundering or fraud" and "while the government correctly points out that the applicable

guideline in this case does not take into account the amount of monetary transactions involved, that was the result of the government's choice of the appropriate offense for which it sought an indictment from the grand jury and is the consequence of the offense to which the defendant pleaded guilty").)  The government's extreme sentencing position as to Mr. Hayes is inexplicable given its track record of "non-prosecution" of individuals responsible for organizational BSA violations.

Sentencing Ben to a probation-only sentence would also not create any disparity with the Court's recent sentencing of Mr. Hayes.  The Court sentenced Mr. Hayes to six months home confinement with location monitoring and two years' probation.  (Hayes Sentencing Hr'g Tr. at 56:2-8.) ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████

Since Ben has no residence in the United States, imposing a condition of home confinement raises additional concerns.  His home is in Hong Kong, although he has established a temporary residency in Bermuda during the pendency of this case. █████████████████████

████████████████████████████████████████████████████████████

██████████████████████████  As a practical matter, Probation has no established way to implement and supervise home confinement in Hong Kong, or any other foreign country. Whether the Court may even order home confinement in a foreign country is unknown; such a sentence also implicates comity concerns.  In another recent case in this district, the government appealed the imposition of a term of home confinement to be served in the defendant's country of residence, taking the position that authority for such a sentence was unclear.  *See* Principal and Resp. Br. for Appellee/Cross-Appellant United States of America, *United States v. Connolly*, 19-

3806 (2d Cir. Sept. 24, 2020), ECF No. 145. Authority for a sentence of probation to be served in a foreign country appears to be well established. *See United States v. Yagami*, 14-cr-272 (S.D.N.Y. March 13, 2017), ECF No. 282 (sentencing defendant to a two-year term of supervised release to be served in Hong Kong "without actual physical supervision"); *see also United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (affirming district court's probation sentence to be served in Belgium); *United States v. Saltsman*, 07-cr-641 (E.D.N.Y. July 28, 2010), ECF No. 163 (sentencing defendant to probation to be served in Israel). These factors present additional reasons to forego a condition of home confinement when imposing a sentence.

### iv. A Sentence of Probation Adequately Considers the Sentencing Objectives in 18 U.S.C. § 3553(a)(2)

There is nothing inadequate about Probation's sentencing recommendation in this case. For one thing, a sentence of probation is a significant punishment, especially when coupled with the reputational harm and negative impact on Ben's philanthropic projects. *See United States v. Leitch*, 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013) ("[A]s the Supreme Court has recognized, probation is a significant punishment.").

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████  The

impact the criminal conviction has on Ben's charitable giving and the charities he currently

supports are appropriate considerations in determining a just and proper sentence.  *See United*

*States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (instructing that, in order to "properly calibrate

a 'just punishment,'" a trial court must "consider the collateral effects of a particular sentence");

*United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (imposing a below-

Guidelines, non-custodial sentence "███████████████████████████████████████████████

████████████████████████████████████████████").

Further, courts have noted that specific deterrence is "not required" where the defendant

has a "law abiding background" and is therefore unlikely to "engage in further criminal activity."

*United States v. Faiella*, 2008 WL 4862455, at *2 (E.D.N.Y. Sept. 8, 2008).  The same is true

here.  Ben has otherwise led a law-abiding life and sought to be a benefit to the communities

where he has lived.  The criminal charges have upended Ben's career and forced him to take a

step back from his professional and philanthropic ventures.  Ben has also shown contrition,

stating openly and repeatedly that he wished he could have done things differently and, without excusing his conduct, he regrets being young and naïve and not acting swiftly enough to address U.S. user issues.  (PSR ¶ 63.)



. Ben has suffered and will continue to suffer the devastating professional, financial, and personal collateral consequences that flow from a BSA violation conviction.

[6]

## VI.    CONCLUSION

Ben understands fully that he stands convicted of a federal felony and that his conviction has had and will have consequences.  The arguments that we advance on his behalf do not in any way seek to diminish the seriousness of the offense for which he has been convicted, and Ben recognizes that some form of punishment is necessary to address his failure to rectify BitMEX's BSA failings.  Our purpose is to highlight many of Ben's positive attributes and contributions,

---

[6] *See* Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 6-9 (Mar. 2017), https://www.ussc.gov/sites/default/files/ pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf.

and place in context his role in BitMEX's failure to adhere to U.S. law.  Ben's personal story is compelling.  He dealt with and overcame Asperger's syndrome to become a brilliant and prolific computer scientist.  He aspired to repay his debt to those who helped him along the way and, immediately following his commercial success, selflessly gave away his money to causes that will benefit not only those who suffer from similar autism spectrum disorders, but also generations to come as Ben focuses his giving on the world's most pressing issues.  ████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████.

For the foregoing reasons, we respectfully request that the Court impose a probationary sentence to be served in Hong Kong, Ben's country of residence.  No fine should be imposed since Ben has paid $10 million in a civil money penalty to the CFTC as contemplated by the plea agreement.

Dated:  New York, New York
       June 1, 2022

               Respectfully submitted,

/s/   *Harlan A. Levy*
Harlan A. Levy
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (646) 927-5500
hlevy@foleyhoag.com

/s/   *Patrick J. Smith*
Patrick J. Smith
Andrew J. Rodgers
Selbie L. Jason
SMITH VILLAZOR LLP
250 West 55th Street, 30th Floor
New York, New York 10019
Tel: (212) 582-4400
patrick.smith@smithvillazor.com
andrew.rodgers@smithvillazor.com
selbie.jason@smithvillazor.com

*Attorneys for Defendant Benjamin Delo*