**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 7, 2022

**BY ECF, E-MAIL, and HAND**

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: *United States v. Benjamin Delo*, 20 Cr. 500 (JGK)

Dear Judge Koeltl:

      The Government respectfully submits this letter in advance of the sentencing of defendant Benjamin Delo, currently scheduled for June 15, 2022 at 4:30 p.m., and in response to the defendant's sentencing memorandum ("Def. Mem").

      Benjamin Delo was the co-founder, 30 percent owner, and a high ranking executive, of BitMEX. Delo earned hundreds of millions of dollars from BitMEX's operations, while willfully and continuously operating the Company in violation of the Bank Secrecy Act ("BSA"), by failing to implement an anti-money laundering ("AML") program. During the charged period, as BitMEX grew to become one of the largest cryptocurrency derivatives platforms in the world, the defendant enabled BitMEX to allow its users to transact trillions of dollars anonymously, because he and his co-founders decided not to implement a know-your-customer ("KYC") procedure. Because of his background in financial services and his role in operations and strategy at BitMEX, he was a critical organizer and leader of the Company's criminal decision to fail to implement an AML program consistent with the BSA. Over the course of the charged period, Delo learned, frequently, that BitMEX's customers included nefarious actors using the platform for illegal purposes, but took no steps to actually implement a KYC or AML program.

      As the Court knows, the Government requested an above-Guidelines sentence of more than one year's incarceration for Delo's co-defendant and co-founder of BitMEX Arthur Hayes. On May 20, 2022, the Court instead sentenced Hayes to two years' probation, with the first six months to be served on home detention. The Government respectfully disagrees with that sentence as to Hayes, and believes that on a blank slate, the relevant Section 3553(a) factors all weigh in favor of an incarceratory sentence of more than one year for Delo. However, recognizing that such a sentence would create a sentencing disparity with Hayes, the Government instead requests that the Court impose on Delo the same sentence it imposed on Hayes: a Guidelines sentence of two years' probation with six months' home detention in the United States.

## I.      Delo's Conduct

### A.  Background of BitMEX

Delo, Hayes, and Sam Reed are the co-founders and equal owners of BitMEX.  They launched BitMEX in 2014. (Presentence Investigation Report ("PSR") ¶ 14). During applicable periods from that launch to at least in or about October 2020, the Company offered financial derivatives, including futures contracts and swaps, tied to the price of Bitcoin and other cryptocurrencies, which settled in Bitcoin. (PSR ¶¶ 14–15). Because BitMEX operated in the United States, including through offering its products to U.S. customers and operating offices in the United States, the Company was a futures commission merchant ("FCM"), which is required under the Commodity Exchange Act ("CEA") to register with the Commodity Futures Trading Commission ("CFTC"), and is a financial institution which must comply with the Bank Secrecy Act.  (PSR ¶ 15). From its launch in 2014, BitMEX acted in violation of the BSA; Delo and his co-conspirators began willfully violating that law by at least in or about September 2015, when the CFTC issued regulatory orders announcing its view that cryptocurrency is a commodity, and the defendants knew that their failure to implement an AML program while operating in the United States was unlawful.

Delo was a leader in BitMEX's criminal failure to comply with the BSA.  As COO and Chief Strategy Officer, and with his approximately five years of experience in financial services before the launch of BitMEX, he led and organized his co-conspirators and other employees at BitMEX in the charged criminal conduct.  (PSR ¶¶ 19, 56, 109–110).

From its inception, BitMEX, with Delo's full knowledge, flaunted its avoidance of KYC requirements. In its earliest days, BitMEX advertised that it did not perform know-your-customer checks. Shortly before the launch of the program for live trading in November 2014, Hayes wrote to Delo that BitMEX would not do any KYC, ███████████████████████████ ███████████████████████████ In about 2015, the website advertised that "No real name or other advanced verification is required on BitMEX." (PSR ¶ 18). Until at least August 2017, BitMEX's registration page required users to provide a username, email address, and password; but explicitly stated that first and last name were "not required" to register and were only "used for verification purposes if you lose your two-factor auth[entication]" for account login. While that language on BitMEX's website was later removed, BitMEX still did not require users to verify their identities until after the Indictment was unsealed.

### B.  Delo Understood, and Defied, U.S. Law

While Delo is not an attorney, he and his co-defendants followed global regulation of cryptocurrency, particularly from the United States, very closely.  Those regulations guided BitMEX's business decisions.  First, the defendants chose to incorporate in the Seychelles specifically because the country "had no clarity on Bitcoin." (PSR ¶ 16). Second, the defendants designed the very architecture of BitMEX to avoid KYC regulations, stating that they chose to

transact with BitMEX's customers exclusively in Bitcoin because, as of 2014, their view was that there was no "gov[ernmen]t regulation covering KYC or AML" for such transactions. (PSR ¶ 16).[1]

Delo and his co-founders soon came to understand that their business model did not exempt them from KYC and AML regulations. In September 2015, the CFTC issued two public administrative actions, which announced the Commission's view that cryptocurrency was a commodity subject to regulation under the CEA. (PSR ¶ 17(b)). As Delo admitted in his allocution, he "understood that if we had U.S. users on the platform who were actively trading that we were in the U.S. for regulatory purposes," and that he understood that "being in the U.S. meant that BitMEX was supposed to have a customer identification program." Plea Tr. at 18.

Given the choice between complying with the BSA or withdrawing from the United States, the defendants putatively chose the latter: they put a notice on BitMEX's website and in its terms of service stating that U.S. customers were forbidden from creating accounts, and restricted individuals from creating an account using an internet protocol ("IP") address from the United States. (PSR ¶ 17).[2] However, Delo knew that the controls were easily evaded, and did not take simple steps to restrict more U.S. customers from accessing the platform.

Delo knew U.S. customers continued to access BitMEX through several means. First, BitMEX already had a significant number of U.S. users in September 2015 and made no effort to remove them. (PSR ¶ 24). Second, he and his co-defendants did not actually bar U.S. IP addresses from the platform. Instead, BitMEX only ran a single IP address check when new users created accounts, even though Delo knew that users could easily avoid the initial check, including by using virtual private network services ("VPN")[3] and then make subsequent logins from U.S. IP addresses.[4] (PSR ¶¶ 29–32). Third, BitMEX intentionally marketed to U.S. customers, including through Hayes' appearances on U.S. media outlets and through the BitMEX affiliate user

---

[1]  The Department of Treasury had in 2013 published public guidance documents that it interpreted the BSA as covering institutions that exchanged between cryptocurrency and fiat currency.

[2]  Even these restrictions did not mean the Company was not operating in the United States, since Reed, and later Greg Dwyer, were physically based in the United States while carrying out their duties, and BitMEX had numerous other employees physically present in the U.S., including from an office in Manhattan.

[3]  The Government has repeatedly pointed out that other companies, like Netflix, implemented "standard measures" to restrict VPNs.  Exhibit M at 8 (Gov't Response to Delo's Objections to Initial PSR).  In response, Delo asserts that "Netflix's controls were far from foolproof," Def. Mem. at 28 n.4. That entirely misses the point: Delo knew U.S. persons were accessing BitMEX via VPN, and instead of implementing standard if imperfect measures to block such VPNs, he and BitMEX simply ignored the issue, too interested in earning revenue from such customers.

[4]  Delo suggests that the "evolution of the controls" at BitMEX over time is a mitigating factor, but provides no reason for why the Company initially took no steps whatsoever to restrict what he calls "legacy users" from easily evading BitMEX's controls, or why the IP address check was only run a single time. Def. Mem. at 21.

program.[5] (PSR ¶¶ 33–35). Fourth, Delo allowed some prominent users who he personally knew were U.S. persons to access and trade on BitMEX's platform openly.[6] (PSR ¶¶ 17, 24–27). Finally, as defendant Hayes acknowledged, users whose accounts were closed because they had been flagged as from the United States could still open a new account, even if they used the exact same email address as the closed account. Hayes Mem. at 14 n.9. The Government has identified multiple such users who did precisely that and then continued to freely operate on BitMEX.

The presence of U.S. users was far from incidental. On the contrary, as late as July 2017, nearly two years after claiming to have banned U.S. users, Delo received a report from Greg Dwyer that showed that the "United States remains the most popular country by visits and average number of active users per day." (PSR ¶ 21).[7] Subsequent monthly revenue reports continued to show the presence of U.S. users on BitMEX. (PSR ¶ 22). Like Hayes, Delo claims that BitMEX turned away large numbers of U.S. users; Delo flatly states that the Company turned away "at least

---

[5] Delo argues that BitMEX never intentionally marketed to U.S. customers. Def. Mem. at 25. But the very evidence he cites disproves that. Precisely as described in the PSR, paragraph 35, BitMEX's former head of marketing described that the Company communicated with influencers to assist in marketing; the former head of marketing specifically named the well-known U.S. affiliate denoted as "User-2" as one such influencer. (04/23/2019 ██████ CFTC Tr. at 29–30). The defendants may have publicly stated BitMEX did not accept U.S. customers, but their marketing efforts were designed to entice such putatively restricted individuals.

[6] As described in the PSR, Delo had multiple conversations with Greg Dwyer about prominent U.S. affiliate "User-1's" residency in the United States in November 2018. (PSR ¶ 25). That same month, Delo learned that User-1 had provided false Canadian identification information to retain access to BitMEX, and nonetheless was allowed to continue to access BitMEX. (PSR ¶ 25). Delo asserts that this only occurred because "BitMEX's legal department overruled Ben and permitted User-1 to maintain his account after passing BitMEX's user verification program with a friend's Canadian identification." Def. Mem. at 28. The Government does not have communications between Delo or other BitMEX employees and BitMEX's legal department, which presumably were withheld from production to the Government as privileged, and so cannot ascertain whether Delo or other BitMEX employees accurately described the factual circumstances to BitMEX counsel, including Delo's own subjective understanding that User-1 was located in the United States but then lied to BitMEX Support staff. This is thus a blatant attempt to use the attorney-client privilege "as a shield and a sword," and "for self-serving purposes," which the Court should not countenance absent a waiver of privilege to reveal whether Delo informed legal counsel of all applicable facts before putatively being "overruled." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (citations omitted).

[7] This report, and a similar report from January 2017, belie Delo's apparent attempts to cabin his knowledge that U.S. users were accessing and trading on the platform to only in about the middle of 2018. Def. Mem. at 24 (Delo "did not act immediately *in July 2018* to restrict all accounts that had been logging in from U.S. IP addresses", and "in June 2018 when BitMEX began tracking and logging U.S. IP addresses at login, BitMEX did not immediately act to restrict trading from this set of known U.S. users.") (citation omitted). Rather, for years the defendants including Delo knew well that U.S. customers were accessing the platform and trading BitMEX's derivatives products.

$109,842,340 in potential U.S.-based revenue."[8] Def. Mem. at 24. His primary source for that claim is the pretrial report of a defense "expert" witness, but as the Government's briefing demonstrated, that report was riddled with errors. Dkt. No. 280 at 15–17, 18–21.[9] As defendant Hayes acknowledged, when BitMEX did shut down U.S. accounts, the same user could easily create a new account, using the same email address, a practice that appears to have been common, and a practice that would not be identified by the expert report.

Despite Delo and his co-founders' knowledge that allowing these users meant that BitMEX was subject to U.S. law including the BSA, BitMEX never required all users to provide their real names and identification documents until after the unsealing of the Indictment; nor did the Company file any SARs with FinCEN between its launch and the unsealing of the Indictment, despite ample knowledge of suspicious activities.

### C.  The Defendant Knew that BitMEX was a Tool for Criminal Activity

As a result of Delo's decisions not to implement an AML program, BitMEX became a magnet for money laundering and criminal activity, which Delo knew and did little to stop. Because BitMEX did not require KYC, the full scope of criminal conduct on BitMEX will never be known. BitMEX, still owned by Hayes, Delo, and Reed, accepted a settlement with the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") in which it neither admitted nor denied FinCEN's finding that it had conducted more than $200 million in suspicious transactions, and that the Company had failed to file SARs on nearly 600 specific suspicious transactions. (PSR ¶ 42); FinCEN Announces $100 Million Enforcement Action Against Unregistered Futures Commission Merchant BitMEX for Willful Violations of the Bank Secrecy Act, *available at* https://www.fincen.gov/news/news-releases/fincen-announces-100-million-enforcement-action-against-unregistered-futures. As the Government described in its memorandum related to Hayes' sentencing, the Government has seen BitMEX surface repeatedly in its own criminal investigations.[10] In his supposed defense, Delo argues that this proves BitMEX "had an excellent track record of cooperating with U.S. law enforcement inquiries." Def. Mem. at 29–30. Of course, the Company never complied with the actual requirements imposed by U.S.

---

[8]  Delo even far overstates the conclusions of his own expert report, which did not flatly state that the Company turned away any specific sum, but instead made "reasonable estimates" of the amount of money the Company supposedly abjured. Def. Mem. Ex. I at 3.

[9]  Further, even this amount of money supposedly turned away by the Company is about half of the amount of suspicious transactions FinCEN identified in its consent order, described below.

[10]  Delo bizarrely argues that the Government "plays on outdated views of cryptocurrencies as inherently nefarious and providing 'pseudonymity' to criminals." Def. Mem. at 29. Whether those are the Government's views or not, they certainly were the views of the defendant and his co-conspirators, who advertised that BitMEX users did not need to provide their "real name[s]" in 2015, that true identities were "not required" until at least August 2017, and indeed, released a research paper concluding that a specific cryptocurrency "also potentially allows users a degree of anonymity when making or receiving transactions," and that those "characteristics potentially make it attractive to criminals, just like Bitcoin." https://blog.bitmex.com/tether (blog post dated February 2018) (accessed June 3, 2022).

law, and never filed a SAR[11]; and even after learning again and again about criminal conduct on the platform, took no steps until the Indictment was unsealed to actually implement a BSA-compliant AML program.

BitMEX's deficient compliance program extended to its treatment of U.S. sanctions laws. From the earliest days of the company, compliance consultants offered their services to BitMEX, and mentioned that they offered sanctions programs. BitMEX counterparties also sometimes mentioned the need for a counter-sanctions program. However, Delo did not take these statements seriously. In about January 2017, Hayes and Delo both told Iranian customers that they were free to trade. (PSR ¶ 45). By no later than October 2017, Delo knew that the company could not transact with individuals on the U.S. sanctions list, and implemented some controls designed to try to restrict such transactions. (PSR ¶ 45). However, he did not take steps to ensure that the customers he had authorized had been removed from the platform. (PSR ¶ 45). Without an adequate KYC program, BitMEX could never be sure it was not dealing with sanctioned individuals, who could use the same simple methods to evade the controls as those used by U.S. persons. As a result, BitMEX internal reports shared with the defendant showed that BitMEX continued to earn revenue from customers in Iran through at least April 2018, and Delo understood as late as November 2018 that the company did not have "strict enforcement of US sanctions against Iran etc.," and sometimes "let these people slip through the cracks." (PSR ¶ 46).[12]

### D.  Delo Lied About BitMEX's Operations

Delo directly made misrepresentations to support BitMEX's operations. From in about 2016 through at least 2018, Hayes, Delo, and others at the Company made a series of false statements and submitted false documents to the Hong Kong branch of ███ regarding Shine Effort, a BitMEX affiliate. Hayes, Delo, and other BitMEX employees told ███ that Shine Effort was actually independent and owned by Delo, with no connection to cryptocurrency. These false statements were designed to allow BitMEX access to bank accounts for payment of various corporate expenses and make U.S. dollar wire transfers. (PSR ¶ 50). Delo, Hayes, and the others conspired to make these misrepresentations because of their belief that were ███ to learn the truth, the bank would decline to allow Shine Effort to open a bank account, or later that ███ would close the account. For example, in April 2017, ███ requested additional information about the Shine Effort account. (PSR ¶ 50). Hayes contacted an associate about BitMEX's desire

---

[11]  BitMEX's infrequent filing of far less detailed suspicious transaction reports with the Seychelles authorities is not a mitigating factor. *Contra* Def. Mem. at 30–31.

[12]  Delo considers it mitigating that he implemented "controls comparable to those prohibiting U.S. customers" to restrict transactions with individuals in sanctioned jurisdictions. Def. Mem. 31. Of course, Delo pleaded guilty to violating the BSA because he knew well that those controls were inadequate. Nor is the question of whether Delo could be convicted for violating U.S. sanctions mitigating or even relevant: his knowledge that the Company he co-owned was not complying with U.S. sanctions is aggravating regardless of whether he personally could be convicted of that crime. Def. Mem. at 31, n.5. The Government does note that through his knowingly inadequate controls on users from sanctioned jurisdictions, the defendant caused BitMEX's employees located in the United States to provide services to such users, in violation of IEEPA.



namely Shine Effort. Hayes wrote ██████

████████████████████████████████ Similarly, in October 2018, when trying to obtain false documents to submit to the bank that omitted references to cryptocurrency, (PSR ¶ 53), Hayes wrote to a BitMEX employee he was trying to obtain a contract ████████████████

██████████[13]

## II.   Procedural History

On October 1, 2020, Delo's co-defendant Samuel Reed was arrested in Massachusetts, and the Indictment was unsealed. Delo self-surrendered on March 15, 2021. After pre-trial motion practice, he ultimately entered a plea of guilty to Count One of the Indictment, violating the Bank Secrecy Act, in violation of Title 31, United States Code, Sections 5318 and 5322; and Title 31, Code of Federal Regulations, Sections 1026.210 and 1026.220, about a month before trial was scheduled.  He is the second defendant to be sentenced in this case; as the Court knows, Arthur Hayes was sentenced to two years probation, six months' home detention. His sentencing is scheduled for June 15, 2022.

## III.   Presentence Investigation Report

The Probation Office has calculated the offense level as follows, and as consistent with the plea agreement: (1) pursuant to U.S.S.G. § 2S1.3(a)(1), the base offense level is 8; (2) pursuant to U.S.S.G. §3B1.1(a), because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, four levels are added; (3) two levels are removed for acceptance of responsibility, so the specific offense level is 10. (PSR ¶¶ 66–75). The defendant has no criminal history points, and is in Criminal History Category I.

---

[13] The Government originally briefed the admissibility of this conduct as direct evidence of the charged crimes and as potential 404(b) material in its motion *in limine*, and the Court reserved decision. For purposes of sentencing, Delo's lies to ████ Hong Kong are appropriately considered both because they were intertwined with and an integral part of the crime of conviction and as part of his "background, character, and conduct." 18 U.S.C. § 3661.

Delo tries to reverse blame for his lies, castigating the victim of his conduct for failing to run a Google search to determine his connection to BitMEX. Def. Mem. at 31–32. But that is obviously not relevant to Delo's own misleading conduct. Nor is it accurate to claim that Delo "openly disclosed his BitMEX affiliation to the bank," at least until late 2018. In August 2017, ████████ reached out to Delo for further information about Shine Effort. Delo responded with ████████ ██████," which was a lightly edited BitMEX slide deck, replacing "BitMEX" with "Shine Effort" (except in one place); along with what he called his "CV." That CV is attached as Exhibit A; notably, ████████████████████████████████████████ ██████. That assertion on the CV sent to ████ is obviously false, as reflected in his own work history described in the PSR. (PSR ¶¶ 107–108).

This offense level and criminal history category lead to a Guidelines range of 6 to 12 months' imprisonment. (PSR ¶ 118.) The Government agrees with the Probation Office's calculation.

Probation has recommended a non-incarceratory sentence, with two years' probation. (PSR p. 49–52). This recommendation is based on Probation's view that the offense was a violation of the "requirements of the banking laws," he has been compliant while out on bail, his charitable contributions, ██████████████████████████. Probation also cites to the $10 million fine the defendant has agreed to pay.

### IV.    A Sentence With a Period of Six Months' Home Detention in the United States is Appropriate Under the 3553(a) Factors

#### A.  Applicable Law

As the Court knows well, the Sentencing Guidelines are no longer mandatory after *United States v. Booker*, 543 U.S. 220 (2005).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See United States v. Crosby*, 397 F.3d 103, 111-13 (2d Cir. 2005), *abrogated on other grounds by United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005). First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112; *see also United States v. Corsey*, 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. *See Crosby*, 397 F.3d at 112. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

#### B.  Discussion

The Government previously argued that co-defendant Arthur Hayes' conduct merited an above-Guidelines sentence of incarceration. On a blank slate, the Government would take the same

view here. Delo's academic and professional record, the seriousness of the offense, the manner that the offense exhibited deep disrespect for the rule of law, the need for the sentence to afford adequate deterrence, and the anomalous Guidelines range all weigh in favor of such a sentence. Recognizing that the Court disagreed with that recommendation, the Government agrees that Delo does not merit a lengthier sentence than the Court imposed on Hayes, because such a sentence would create an unwarranted disparity. Thus, the Government respectfully requests that the Court impose a sentence within the Zone B Guidelines range. Such a Guidelines sentence requires some period of confinement. U.S.S.G. 5C1.1(c) ("If the applicable guideline range is in Zone B of the Sentencing Table, the minimum term may be satisfied by-- (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one month is satisfied by imprisonment; or (3) a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in subsection (e)."). The Court should impose the same sentence on Delo as it did Hayes: two years' probation with the first six months to be served on home detention in the United States.

In response, Delo requests a below-Guidelines sentence, with no period of confinement. But each of the relevant sentencing factors weigh in favor of a Guidelines sentence with six months' to be served on home detention, and Delo's proffered reasons in favor of his requested sentence are insufficient.

### *Seriousness of the Offense*

First and most importantly, a Guidelines sentence with six months' home detention is merited because of the seriousness of the offense.[14] Delo was a leader of a criminal enterprise[15] at the Company he founded for half a decade. As part of that criminal conduct, Delo availed himself of the benefits of operations in the United States, including by allowing U.S. customers to access the platform. But he thumbed his nose at U.S. law, namely the BSA, and its provisions designed to safeguard the financial system from illicit use. As a result, Delo created a significant platform for cryptocurrency users to launder money without providing their true identities. FinCEN identified more than $200 million in suspicious transactions on BitMEX's platform. Delo earned

---

[14]  Delo strangely claims that this was "not an aggravated BSA violation," whatever that means. Def. Mem. at 1. While each defendant is of course slightly differently situated from each other, in relevant respects Delo is as culpable as Arthur Hayes. None of the factors he highlights are particularly mitigating. Indeed, his argument that he did not "set out to violate the BSA," Def. Mem. at 1–2, from BitMEX's inception is belied by the emails in which Hayes and he discussed setting up BitMEX before the platform was even launched, that BitMEX would not do any KYC, ███████████████████████████████████████████████████████████ BitMEX's website maintained clear descriptions of the lack of KYC through at least August 2017, consistent with the lack of KYC being a critical feature of the platform.

[15]  Delo tries to reject the use of the term "criminal enterprise," focusing solely on the statutory language, Def. Mem. at 27 n.3, ignoring the fact that he led a years'-long willful criminal violation that allowed tens of millions of dollars of suspicious transactions to be completed on BitMEX.

hundreds of millions of dollars from BitMEX, even while it operated illegally for at least half a decade.[16] Ultimately, while the defendant requests a non-confinement sentence because he has few friends or family in the United States, Def. Mem. at 35, he helped decide to allow BitMEX's products to be offered to U.S. users, while willfully violating our laws. The very least such conduct merits is a period of detention in which he is subject to the supervision of the U.S. Government on U.S. soil.[17] While that sentence may have a negative impact on his personal circumstances, Def. Mem. at 34, it was Delo who made the conscious decision to violate our law and ████████ ████████████████████████████████.

The offense is also particularly serious given the other conduct which the Government has proffered. His intentional decision not to implement a full KYC and AML program meant that he personally knew the Company was violating the law by '████████████████████████████ ████████████████████' and continue trading on BitMEX. His lies to ████████ further reflect the need for such a sentence.[18]

### Need to Avoid Unwarranted Sentencing Disparities

A Guidelines sentence with six months' home detention is also appropriate to avoid unwarranted disparities, including with Arthur Hayes. As the Government argued in relation to Hayes' sentencing, courts have imposed substantial jail sentences on defendants who violate the BSA through operation of an unlicensed money transmitting business,[19] even if such individuals were not convicted of violations of Title 31 like Delo and Hayes. *See United States v. Chukharev*,

---

[16] Delo's complaint that the Government attempts to "engraft elements of monetary gain . . . onto the offense," Def. Mem. at 1, rings hollow given the somewhat obvious conclusion, recognized by Probation in Hayes' PSR, that Delo failed to implement an AML program because of his desire to facilitate the continued operation and success of BitMEX, and therefore the resulting monetary gain.

[17] His suggestion that because "Probation has no established way to implement and supervise home confinement" in a foreign country, the Court should not even impose such a condition at all, is galling. Def. Mem. at 40. He chose to commit an offense against the United States from a foreign country; that residence should not lead him to receive a lesser sentence. To the extent the defendant prefers to spend the Guidelines period of confinement in prison rather than on home detention, the Government would not disagree with such a request.

[18] Delo asserts, in flat contravention of governing law, that the Court should not rely on "uncharged conduct." Def. Mem. at 30–32. *Contra* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

[19] Delo spends pages citing to other resolutions the Department of Justice entered into with other financial institutions. Def. Mem. at 37–39. As far as the Government understands, each of those institutions at least had *some* AML and KYC program, even if inadequate. This case is unique because the defendants designed BitMEX to operate in the United States while wholly ignoring the BSA.

13 Cr. 368, Dkt. No. 146, at 5 (S.D.N.Y.) (DLC) (three-year sentence for minor participant who violated Title 18, United States Code, Section 1960(b)(1)(B), for a crime which Judge Cote described as "essentially understanding that the business [] was required to have a license for its operations and did not"). Notably, *Chukharev* is a case in which the defendant received a three-year sentence purely for a violation of 18 U.S.C. § 1960, and the defendant was not convicted of money laundering, fraud, or other similar offenses, and is thus a closely analogous comparator case for sentencing purposes. The Government recognizes, however, that the most closely analogous sentence is that imposed on Hayes.

A non-confinement sentence would lead to a meaningful and unwarranted disparity compared with Hayes. There is no reasoned basis to conclude that Delo is "meaningfully less culpable" than Hayes. Def. Mem. at 2. As is undisputed, Delo and Hayes were both leaders at BitMEX, and of the criminal conduct engaged by the Company. Like Hayes, Delo had years of prior experience in financial services, and knew well the consequences of allowing BitMEX to operate with no AML. While Hayes had more responsibility over BitMEX's marketing and compliance function,[20] Delo had his own responsibilities, and Delo's included, by his own light, "improv[ing] the U.S. user controls" which he designed to remain inadequate, and thus Delo's conduct directly led to U.S. users accessing the platform. Def. Mem. at 35–36. Like Hayes, Delo was included on some of the dozens of law enforcement inquiries that BitMEX received, and never thereafter pushed for the Company to actually implement anti-money laundering programs.

### Need to Promote Respect for the Law

A Guidelines sentence is necessary to promote respect for the law and to afford adequate specific and general deterrence. The defendant defied U.S. law for years, belying his assertion that he was wholly committed to the "rule of law" or has "led a law-abiding life." Def. Mem. at 36, 42–43. The defendant committed this offense, as he allocuted to, willfully, intentionally contravening U.S. law. Contrary to his assertion, the Court should absolutely consider his statement, the day after the 1Broker decision, to which Delo responded to that decision "███████████ ████" and later falsified internal records to hide that User-2 was located in the United States.[21] Only a Guidelines sentence could properly reflect the disrespect the defendant showed to U.S. law.

---

[20] Delo admits, however, that he had *some* compliance role: he "personally participated in policing" BitMEX's policy related to corporate customers, Def. Mem. at 22, and "was also involved in the human controls through the customer support function." Def. Mem. at 23.

[21] Delo's attempted defense of this communication is nonsensical. Def. Mem. at 26. There is no other way to read that communication other than as a cavalier disregard for U.S. regulation. In the exchange, Delo clearly stated his view that 1Broker's problem was that it "██████████████████ ████████." It was not a "misunderstanding" that led Delo to take steps to ensure that BitMEX continued to *covertly* accept U.S. residents, and personally falsified records to do so. This is no "counterfactual," Def. Mem. at 28: the evidence clearly establishes that instead of removing User-2 in September 2018, Delo changed his apparent country of residence, and that thereafter User-2 executed about six completed trades. Def. Mem. Ex. M at 6. Even now, Delo does not express remorse for allowing User-2, a person in the United States, to access and trade on BitMEX's

### *History and Characteristics*

A Guidelines sentence is also appropriate given Delo's history and characteristics. With his strong academic and employment credentials, he could have continued in remunerative jobs like those he performed before founding BitMEX. (PSR ¶¶ 109–110). Instead, he decided to engage in the instant conduct, leading BitMEX and its years-long criminal offense. With respect to Delo's charitable deeds, while the Government understands they are substantial, [22] the Guidelines describes that such "prior good works are not ordinarily relevant in determining whether a departure is warranted." *See* U.S.S.G. § 5H1.11. Additionally, the fact that the defendant was able to give millions of dollars to charity no doubt resulted in large part from the fact that he personally received ██████████ in dividends from BitMEX while the company systematically flouted the BSA for a period of five years.

This Court should absolutely reject Delo's argument that a below Guidelines sentence is warranted because of the "stigma of being a convicted felon." Def. Mem. at 43. Indeed, in the case Delo himself cites, the Court determined that such a stigma was insufficient, and imposed an incarceratory sentence. *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007), *aff'd*, 523 F.3d 1258 (10th Cir. 2008). Numerous other courts have flatly rejected this argument. *See, e.g.*, *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("no 'middle class' sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. . . Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.").

### *Immigration Consequences*

Finally, at various points in his submission Delo cites to the complications of a sentence of home confinement in a foreign country, or the potential immigration consequences of an incarceratory sentence. Def. Mem. at 37, 40–41. The Government does not believe there is anything complex about a sentence of home confinement at a location in the United States, ██████, or that a sentence of home confinement in the United States would carry immigration consequences; ████████████████████

---

platform, but only states that User-2 was removed because "he was instructing users online about how to circumvent BitMEX's controls." Def. Mem. at 29.

22 ██████████████████████████████

## V.        Conclusion

For the reasons stated above, the Court should impose a sentence of probation, with a period of six months' home detention in the United States, consistent with the applicable Sentencing Guidelines range for a Zone B sentence, which is necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a).

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: *Samuel Raymond*
Samuel L. Raymond
Thane Rehn
Assistant United States Attorneys
(212) 637-6519

cc: Counsel for Defendant Benjamin Delo